ST. JOHNS NATIONAL BANK *v.* STEEL.

1. STATUTE OF FRAUDS—BANK DIRECTORS—REPRESENTATIONS AS TO CREDIT.

Where a director of a bank, in discounting a note for the benefit of another person, was acting, to the knowledge of the cashier, as agent for such person, and not for the bank, he cannot be held responsible by reason of a favorable representation concerning the credit of the maker of the note, unless such representation was in writing signed by him. 3 Comp. Laws, § 9518.

2. FALSE REPRESENTATIONS—EVIDENCE—QUESTION FOR JURY.

It is *held* that the evidence in this case tended to show that defendant falsely represented the maker and indorser of a note discounted for his benefit to be financially responsible, and that therefore the case should have been submitted to the jury.

Error to Clinton; Stone, J. Submitted June 9, 1903. (Docket No. 43.) Decided December 22, 1903.

*Assumpsit* by the St. Johns National Bank against George A. Steel for fraud in obtaining the discount of certain notes. From a judgment for defendant on verdict directed by the court, plaintiff brings error. Reversed.

*Norton & Dooling*, for appellant.

*H. E. & E. L. Walbridge*, for appellee.

MOORE, J. This litigation was commenced December 4, 1899, in the circuit court. It grows out of the discounting by the plaintiff of three notes, the history of which was given by the cashier of the bank upon the trial as follows:

The first one:

"The original note is dated July 20, 1893, made by the Mt. Pleasant Lumber & Manufacturing Company, in amount $2,300, indorsed by R. M. Steel, discounted July 26, 1893. The time was four months. That note was renewed November 24th by a note made by the Mt. Pleasant Lumber & Manufacturing Company in the same amount, $2,300, the same indorser, R. M. Steel, dated November 23, 1893, time four months. That note was renewed March 26, 1894. That was made by the same company, the Mt. Pleasant Lumber & Manufacturing Company, and in the same amount, $2,300, indorsed by R. M. Steel, dated March 26, 1894. This latter note was made for four months, and renewed August 8, 1894, at which time it was reduced to $2,000. This renewal was dated July 30, 1894, for four months, and renewed again on December 4th, for $2,000, same maker and same indorser, dated December 4, 1894, time four months. This latter note was renewed April 8, 1895, by note made by the same parties, the Mt. Pleasant Lumber & Manufacturing Company, indorsed by Robert M. Steel, in the sum of $2,000, dated April 8, 1895, due in four months. This was again renewed August 12, 1895, by a note made by the Mt. Pleasant Lumber & Manufacturing Company in the sum of $2,000, indorsed by R. M. Steel, dated August 12, 1895, for four months. This was renewed December 18th by a note of the Mt. Pleasant Lumber & Manufacturing Company in the sum of $2,000, indorsed by Robert M.

Steel; note dated December 16, 1895, at four months. This was renewed April 21, 1896, by a note of the Mt. Pleasant Lumber & Manufacturing Company in the sum of $2,000, indorsed by R. M. Steel Company, Limited, given for four months, and is charged off to profit and loss June 9, 1897.   The date of this last note is April 20th. This note has not been paid.   The amount due upon it, regarding interest at 5 per cent. annually, is $2,539.44."

The second note:

"The original note was dated June 3, 1893.   It was discounted July 13, 1893, made by the Mt. Pleasant Lumber & Manufacturing Company in the sum of $2,000, indorsed by R. M. Steel, time four months, and went to the credit of R. M. Steel's account.   That note was renewed October 7, 1893, by note made by the Mt. Pleasant Lumber & Manufacturing Company in the sum of $2,000, indorsed by R. M. Steel.   That note was dated October 6, 1893, time four months.   That note was renewed February 13, 1894, by note made by the Mt. Pleasant Lumber & Manufacturing Company in the sum of $2,000, indorsed by R. M. Steel, dated February 12, 1894, time four months. This note was renewed June 2, 1894, by note of $2,000 made by the Mt. Pleasant Lumber & Manufacturing Company, indorsed by R. M. Steel, dated June 15, 1894, time four months.   This note was renewed October 20th by note made by the Mt. Pleasant Lumber & Manufacturing Company in the sum of $2,000, indorsed by R. M. Steel, dated October 18, 1894, time 60 days.   This note was renewed December 21st by note made by the Mt. Pleasant Lumber & Manufacturing Company in the sum of $2,000, indorsed by R. M. Steel, dated December 20, 1894, time four months.   This note was renewed April 23, 1895, by note made by the Mt. Pleasant Lumber & Manufacturing Company in the sum of $2,000, indorsed by R. M. Steel, dated April 23, 1895, time four months.   This note was renewed August 26, 1895, by note of $2,000 made by the Mt. Pleasant Lumber & Manufacturing Company, indorsed by Robert M. Steel, dated August 26, 1895, due in four months.   This note was renewed January 21, 1896, by note of $2,000 made by the Mt. Pleasant Lumber & Manufacturing Company.   This note was dated December 30, 1895, time four months.   That is the present note in suit."

The third note:

"The original note is dated January 17, 1895, made by the Mt. Pleasant Lumber & Manufacturing Company, indorsed by F. W. Carr, in the sum of $1,500, time four months. The proceeds went to the credit of George A. Steel in general account. This note was renewed July 19th by a note of the same amount, made by the Mt. Pleasant Lumber & Manufacturing Company and indorsed by F. W. Carr, dated May 25, 1895, time four months. This note was renewed December 20th by a note of the same amount, $1,500, indorsed by F. W. Carr, made by the Mt. Pleasant Lumber & Manufacturing Company, dated September 23, 1895, time four months. This note was renewed February 11, 1896, by a note of the Mt. Pleasant Lumber & Manufacturing Company in the sum of $1,500, indorsed by F. W. Carr, dated January 27, 1896, time four months. This note was renewed June 27, 1896, by a note of $1,500 made by the Mt. Pleasant Lumber & Manufacturing Company, indorsed by F. W. Carr, dated May 27, 1896, at 6 per cent. The exhibit reads: In the upper left-hand corner '$1,500' in figures.

"'ST. JOHNS, MICH., May 27, 1896.

"'Four months after date, for value received, we promise to pay to the order of R. M. Steel fifteen hundred dollars at the St. Johns National Bank, with —— per cent. interest after maturity.
[Signed]  "'MT. PLEASANT LUMBER & MANUFACTURING COMPANY,
                            "'I. A. FANCHER, Vice-President.
                            "'F. W. CARR, Treasurer.'

"Indorsed on back:

"'Pay to the St. Johns National Bank or order, without recourse on me.

                            "'R. M. STEEL,
                                "'Per GEORGE A. STEEL,
                                    "'Attorney.'

"Also indorsed by F. W. Carr, personally."

In the declaration it was claimed that defendant was a director and vice-president of the plaintiff when these notes were discounted, and was bound to give to the bank the benefit of his judgment as to the value of the paper discounted, and that he knew the notes were worthless, but stated to the cashier of the bank they were good, and that

the cashier relied upon those statements in taking the notes, paying to said defendant the amount for which they were discounted; that the last renewals of said notes have not been paid.   Another claim in the declaration is that it was the duty of the defendant to impart to plaintiff, when the several notes were discounted, any information he had as to the value of the notes, and, instead of doing so, he concealed the information he had that they were worthless.   A third claim is that, contrary to his duty to the bank, growing out of his relation to it as director and vice-president, to take care of its interests, he allowed these notes to be discounted by the bank, knowing they were worthless.

The trial began January 13, 1902.   After the plaintiff's testimony was all in, the court, against the objection of defendant, permitted the plaintiff to amend the declaration as to the first two of the notes so as to recite that the proceeds of the notes "went to R. M. Steel, and not to George A. Steel; George A. Steel then and there acting in the capacity of agent for his father and in his behalf." The defendant was then allowed to amend his plea by giving notice of the statute of frauds.   The defendant then asked the judge to direct a verdict in his favor.   The trial judge was of the opinion that, as to the two notes the proceeds of which were paid to Robert M. Steel, the statute of frauds applied.   He was also of the opinion, as stated in his charge to the jury directing a verdict:

" In an action of this sort brought to recover upon false representations, it is necessary that the plaintiff show what the representations were.   The representations may be oral or in writing, it may be by acts, it may be in various ways; but in this particular case it is claimed that the representations were oral representations.   Now, then, it was devolved upon the plaintiff to show what those oral representations were.   It would be necessary for them to show what the defendant said to the plaintiff at that time upon which plaintiff relied.   It would not be necessary for the plaintiff to show the exact language; it would be necessary for the plaintiff, by its evidence, to show in sub-

stance what the defendant said. I think it would have to be an assertion of some fact then existing or something that had taken place, and the statement of these facts was substantially put in evidence, out of which arose, as a conclusion, that the representation was made as set forth in the declaration. It is not sufficient that the plaintiff give evidence of the conclusion that he drew from the language. True, the language, or its substance, must be given, so that the jury may, from the language, say whether he drew the conclusion, and say whether it is a correct conclusion or not. And therefore to say that we were assured that the makers were good and responsible, without your knowing how those assurances were given or what was said, would simply leave you to draw the same conclusion that the witness drew, or else you would have no premises from which to draw any conclusion at all. And I don't think that the evidence introduced by the plaintiff is sufficient in that regard, and I don't think there is such evidence introduced as shows that such representations were made that were false and fraudulent, and upon which the plaintiff, and in reliance upon which the plaintiff, discounted the note. I don't think there is such evidence either as, all of it taken to be true, would permit you to find a verdict for plaintiff upon that evidence; it is too uncertain in its character, and does not state facts, but conclusions; a mere hypothesis, upon which conclusions could not be drawn; that is, what he thinks or what he believed, without stating what was said or what was the substance of what was said; and in some instances whatever was said was largely an expression of opinion, upon which, under the circumstances, the bank—the plaintiff— did not have a legal right to rely.

"I think there was testimony in the case given by the cashier that, at the time the note was discounted, the defendant told him that F. W. Carr, the indorser, was worth $75,000. I don't remember any evidence being given in the case by the plaintiff showing what F. W. Carr was worth at that time, or any evidence bearing upon what property Mr. F. W. Carr did have. It is just as necessary for the plaintiff in a case of this kind to show the representations are false as it is to show that they were made."

The plaintiff brings the case here by writ of error. Nearly all the oral testimony offered on the part of the

plaintiff was that of the cashier. His testimony as to what was said by Mr. Steel when these notes were discounted is not very clear or very positive. The following are fair examples of his testimony:

" *Q.* On that occasion state whether or not any representations were made by him as to the responsibility of the makers and indorsers upon that note.

"*A.* There was; I could not give the exact language, Mr. Norton.

" *Q.* You may give the substance as near as you can.

"*A.* In a general way we were assured that the makers and indorsers were good and responsible. I think every one of the renewals that were presented on the several · occasions that I have given in relating the history of this paper went through my hands. * * *

"*Q.* On that occasion what was said, if anything, in regard to the responsibility of the parties upon that paper?

"*A.* I was assured that they were responsible; that Mr. Carr was worth $75,000.

"*Q.* Did Mr. Steel state that to you?

"*A.* Yes.

"*Q.* On that occasion state whether or not Mr. Steel stated to you that Mr. Carr was financially embarrassed and insolvent.

"*A.* No, sir. He never told me that his father was financially embarrassed and insolvent. I was assured that the Mt. Pleasant Lumber & Manufacturing Company was responsible. He never informed me that they were financially embarrassed and insolvent.

"*Q.* What was said, on those several occasions that this note was renewed, in regard to the responsibility of the parties?

"*A.* Mr. Steel has repeatedly assured me that the Mt. Pleasant Lumber & Manufacturing Company were perfectly good as far as he knew, that they had plenty of lumber in their yard, that sales were a little slow, that they had plenty of means to pay their debts, that F. W. Carr, so far as he knew, was perfectly responsible. I think he stated that he had qualified upon a bond up there for something like $100,000. In his judgment, they were perfectly good.

"*Q.* Was that true on the several occasions that those renewals were made upon this note?

"*A.* It might not have been upon every occasion, but it

was on several occasions. The note was originally discounted on January 17, 1895; the next or first renewal was the following July,—July 19th; the next one was December 20th."

From the cross-examination of this witness it appears Mr. George A. Steel ceased to be a director of the bank December 2, 1895. He also testified that, as to the first two notes, George A. Steel presented them for his father; that the bank purchased them, and passed the amount thereof to the credit of Robert M. Steel; that at this time Mr. Robert M. Steel's account was overdrawn, and that it was a frequent occurrence for it to be overdrawn; and that until a short time before his failure the bank would not refuse to honor the check of Robert M. Steel, even though his account was overdrawn. He testified, among other things:

" *Q.* Now, you would not have hesitated, would you, in 1893, to take the paper indorsed by Robert M. Steel?

"*A.* No, sir; I didn't hesitate. I would not want to say that I took the paper simply because his name was on the paper.

" *Q.* You would not want to admit that that was not true?

"*A.* No, sir. Mr. R. M. Steel was at that time considered as perfectly responsible,—financially so. It is true that I took the paper that he owned, or offered to the bank for discount, because I saw his name upon the paper, and I relied upon that, understanding his responsibility, in doing that. There were seven directors in our bank in 1893. They were Robert M. Steel, George A. Steel, John Hicks, and I think his son, John C. Hicks, Coleman C. Vaughan, Cooley Ball, Galusha Pennell, and myself. John Hicks is a merchant here in town. Cooley Ball is in the hardware business. I don't know as we had a discount committee that made that their special duty. I don't think we had a discount committee in July, 1893, the 13th.

" *Q.* You don't think you had any discount committee?

"*A.* That is, in the sense that they passed on paper as it was presented.

" *Q.* Did you have a discount committee made up of your board of directors?

"*A.* Yes, I think we did. I would not be sure who

they were, but I think it was Mr. Ball, Mr. Hicks, Mr. J. C. Hicks, if I recollect,—I would not be sure as to that.

"*Q.* You had a discount committee, did you not, during the entire time from July 13, 1893, up to the time that the piece of paper that you now present was discounted at your bank?

"*A.* I think we did; yes.

"*Q.* Did these same persons constitute the same discount committee, or did you have different ones?

"*A.* I don't know; sometimes there might have been a change made. I was not in the habit of presenting paper that was offered to our bank for sale or discount to the discount committee to pass upon it as to whether they would buy it or not.

"*Q.* You passed upon that yourself, did you?

"*A.* Not always. I generally consulted the president of the bank and the vice-president. The president was John Hicks, the vice-president was Mr. Pennell. I don't think I counseled Mr. Hicks and Mr. Pennell in 1893 in regard to the paper upon which Mr. R. M. Steel's name appeared.

"*Q.* You simply took it because his name was upon the paper, as a matter of fact?

"*A.* Not entirely.

"*Q.* Well, that was the principal reason, was it not,— because R. M. Steel's name appeared upon the paper?

"*A.* Well, that was one of the reasons,— probably the principal reason.

"*Q.* Wasn't that the real reason?

"*A.* No.

"*Q.* Now, you say that when George presented this note on the 13th day of July, 1893, he assured you that the paper was good?

"*A.* To the best of my recollection he did; yes.

"*Q.* Will you swear that he made any representations whatever as to that paper?

"*A.* Mr. Walbridge, I don't know as I could swear to that; I think he did.

"*Q.* Don't you know as a matter of fact that, upon that very day when he sold that paper to you, you knew that you were taking the paper of R. M. Steel, knowing that you were buying it, because R. M. Steel's name was upon it, and you considered R. M. Steel good; is that not true?

"*A.* Not entirely; no, not entirely.

"*Q.* Will you swear that George A. Steel made any

representations at that time as to the responsibility of the paper?

"*A.* On or about that time,— yes.

"*Q.* At the time that you bought it, I mean?

"*A.* No, sir; I will not swear that he did.

"*Q.* 'On or about that time,'—what do you mean by that?

"*A.* I mean by that that Mr. Steel was in our office every day; he was a frequent caller there; that these matters would come up, and I would ask about them, and invariably he informed me that these matters were all right. I wouldn't ask him about this until he presented it for sale.

"*Q.* You would not swear that, at the time that he presented that paper to you for sale, he made any representations to you about it?

"*A.* No; on or about that time.

"*Q.* You just said that you would not swear that he did on that day?

"*A.* Yes, I did. I don't known that I ever saw the paper before that time. I don't know as I ever had any talk with George A. Steel about that paper before that day. The $2,300 note was presented to our bank for sale the 26th day of July, 1893. George A. Steel presented that paper to our bank and to me on that day. That paper had not been seen by me before that day, that I know of.

"*Q.* Will you swear that upon that day George A. Steel made any representations to you in regard to the responsibility of the maker and indorser of that paper?

"*A.* I think about that time.

"*Q.* You say that you never saw that paper before the day you bought it; that is, you have no recollection of seeing it; did you have any reason for talking with George A. Steel about buying the paper before you bought it?

"*A.* No, sir.

"*Q.* Isn't it true that you bought that paper of George A. Steel, acting for his father, upon the 26th day of July, because you believed Robert M. Steel to be perfectly responsible, and because he was upon the paper as indorser?

"*A.* That is one reason; yes.

"*Q.* Isn't that the real reason?

"*A.* That may be one of the principal reasons.

"*Q.* Will you swear that upon the 26th day of July, the day he sold the paper to you, that George A. Steel said anything to you about the responsibility of his father or the Mt. Pleasant Lumber & Manufacturing Company?

"*A.* No, I will not.   The proceeds of that note went to the credit of Robert M. Steel on general account.  *  *  * I understood, at the time that we were buying the paper of Robert M. Steel, George was acting as agent for Robert M. Steel, and acting for his father in discounting the paper.   I have looked at the bankbook for the purpose of ascertaining the state of Mr. Steel's account on the 26th day of July, 1893.   The account of Robert M. Steel on July 26, 1893, was overdrawn the sum of $1,299.74."

As to the $1,500 note he testified:

"*A.* I understood that he was presenting it there as George A. Steel personally, and I understood that George A. Steel was acting for himself in selling it, and I was acting for the bank."

It is claimed by plaintiff this testimony shows that George A. Steel made representations that were relied upon by the cashier.   On the part of the defendant it is insisted no representations are shown to have been made that it was improper to make, and that the credit was given because the bank believed that Robert M. Steel was perfectly good, and that the trial judge was justified in his conclusion that the defendant was not liable because of any representation made.

As to the first two of these notes, the proceeds of which were passed to the credit of Robert M. Steel, we do not think it necessary to pass upon the above question.   It is very clear from the testimony of the cashier that, in relation to the discounting of these notes, George A. Steel was not acting for the bank, and the cashier did not understand he was so acting, but, on the contrary, did understand he was acting as the attorney for his father.   The fact that he was a director of the bank did not preclude his offering to the bank paper for discount. · In *Hicks* v. *Steel*, 126 Mich. 408 (85 N. W. 1121), it is said:

" A director may do business with a bank, and may borrow money or discount notes, so long as he does not act for the bank as well as himself; and his relation to the bank may be not different from that of any other patron."

See *Smith* v. *Skeary*, 47 Conn. 47; 1 Mor. Priv. Corp. (2d Ed.) § 527.

He offered this paper for his father, acting as his agent. The proceeds were placed to the credit of his father. George A. Steel obtained no benefit from the transaction. Section 9518, 3 Comp. Laws, provides:

"No action shall be brought to charge any person upon or by reason of any favorable representation or assurance made concerning the character, conduct, credit, ability, trade, or dealings of any other person, unless such representation or assurance be made in writing, and signed by the party to be charged thereby, or by some person thereunto by him lawfully authorized."

In a case upon all fours with this feature of the case, the statute was construed as contended for by the defendant in the recent case of *Third Nat. Bank of New York* v. *Steel*, 129 Mich. 434 (88 N. W. 1050).

As the case stands, it is admitted by defendant the statute of frauds does not apply to the $1,500 note. It is insisted no false representations were made concerning the paper. Counsel quote from the testimony of the cashier at considerable length, and say:

" It is too uncertain and indefinite, too speculative and hypothetical, to be submitted to a jury for it to speculate upon, and to guess at something about which there are no tangible facts in the case which the jury can consider as a basis from which to draw any conclusion one way or the other. It is merely the conclusion of witness, consequently has no force or weight. Witnesses are not permitted to state their conclusions or deductions from facts, but must be confined to the communication of facts simply;" citing 1 Thomp. Trials, §§ 377, 378.

It is also claimed that, if it be conceded representations were made, they were not shown to be false. It is said it is not shown the company was insolvent, nor is it shown Carr was insolvent.

We cannot agree with the conclusion reached by the trial judge and the contention of counsel upon this branch of the case. As before stated, no testimony was put in on the

part of the defendant.    It appears from the testimony of
the cashier that the proceeds of this note passed to the
credit of the defendant.    There was testimony tending to
show that Mr. Steel represented that the maker of this
note was good and that Mr. Carr was worth $75,000.    We
think the correspondence between Mr. Carr and the de-
fendant tended to show that the company was greatly
embarrassed at the times the original note was given and
the renewals made, and that the letter of June 28, 1895,
tends to show that, instead of being worth $75,000, Mr.
Carr was greatly embarrassed financially, as it was stated
therein he did not have a cent to pay railroad fare.    The
testimony as to this note raised a question of fact which
should have been submitted to the jury.

Judgment is reversed, and a new trial ordered.

CARPENTER, GRANT, and MONTGOMERY, JJ., concurred.
HOOKER, C. J., took no part in the decision.