FLORENCE KNIGHT, Appellant, v. RAWLINGS et al.

### Division Two, July 1, 1907.

1. **FALSE REPRESENTATIONS: Solvency: Credit: Not in Writing.** Section 3422, Revised Statutes 1899, providing that "no action shall be brought to charge any person upon or by reason of any representation or assurance made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance be made in writing, and subscribed by the person to be charged thereby, or some person thereunto by him lawfully authorized," is a complete bar to a suit for damages for false representations made to plaintiff that the person to whom she loaned her money was solvent and in good credit, unless such representations were in writing.

2. ———: ———: ———: ———: **Conspiracy.** Nor does it matter whether the false representations were made in good faith, or were known to be false and made to deceive and defraud plaintiff; nor whether the complaint contains averments charging a conspiracy between the borrower and defendant to obtain a loan from plaintiff for the borrower's use and benefit upon the false representation of a trusted friend, the defendant.

3. **STATUTE: Previously Construed: Adoption.** When a statute of another state or country is adopted by the Legislature, the construction placed upon it prior to its adoption here will be presumed to have met the approval of the Legislature adopting it.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

AFFIRMED.

*M. F. Hanley* and *R. P. & C. B. Williams* for appellant.

(1) "Our statute, like the Tenterden Act of England, should be construed as embracing every false representation untinged by a fraudulent intent, but it does

Knight v. Rawlings.

not constructively include any kind of actual fraud in wantonly misrepresenting a man's credit or identity more than any other kind of fraud in fact. Written evidence is therefore not required by our statute if the case be sufficient to show actual fraud." Warren v. Barker, 2 Duval (Ky.) 156; Clark v. Dunham, 86 Ala. 220; Dent v. McGrath, 3 Bush (Ky.) 174; Ball v. Farley, 81 Ala. 292; Hess v. Culver, 77 Mich. 598; Bush v. Sprague, 51 Mich. 41; Bank v. McDonnell, 87 Ala. 736. (2) "False affirmations tinged with actual fraud *malo animo* are excepted from the operation of the statute and should always be actionable without being written." Dent v. McGrath, 3 Bush (Ky.) 174. (3) "The statute was not intended to apply to conspiracies to defraud, and where a representation as to the credit of another is made in pursuance of a conspiracy, and of course in actual fraud, the statute does not apply." Hess v. Culver, 77 Mich. 598; Hodgin v. Bryant, 114 Ind. 401; Coulter v. Clark, 66 N. E. 739. (4) "It is as much a fraud in law to affirm as true what is untrue, though not known to be so, as to assert what is known to be untrue; so, where one makes as of his own knowledge a false representation, not knowing whether it is true or false, it is a fraud as much as if he knew it to be false." Hamlin v. Abell, 120 Mo. 188; Cottrill v. Krum, 100 Mo. 403; Hampton v. McClarrahan, 143 Mo. 507; Ball v. Farley, 81 Ala. 292. (5) The essence of a conspiracy is a concert or combination to defraud which results in damage to the party defrauded. Slight evidence of collusion or concert will suffice to let in the declaration of one of the parties as evidence against all. Such evidence of collusion may be inferred from the relation of the parties and the circumstances surrounding them. Masby v. Commission Co., 91 Mo. 507; Bigelow on Fraud, sec. 6. (6) "In order that an action to recover damages for false and fraudulent representations may be maintained, it is well settled that

it is not at all necessary to show that the defendant had any interest in the subject-matter of the representation or that he was in any way benefited by making the same, or that he was in collusion with some other person who was benefited. He is liable, not upon any idea of benefit to himself, but because of his wrongful act and the consequent injury to the other party." Hampton v. McClarrahan, 143 Mo. 507; 14 Am. and Eng. Ency. Law (2 Ed.), 153; Endsley v. Johns, 120 Ill. 479; Coulter v. Clark (Ind.), 66 N. E. 739. (7) "Where parties occupy confidential relations and one makes false statements to the other, they are fraudulent, whether he knew them to be false or made them in ignorance of the real facts. The law exacts more stringent rules in regard to transactions between parties occupying such relations." Smith on Law of Fraud, sec. 47; Wells v. McGeoch, 71 Wis. 196; Wheeler v. Bass, 33 Fla. 696; Thorn v. Prentiss, 83 Ill. 99; Ruff v. Janett, 94 Ill. 475; Hubbard v. Weare, 79 Iowa 678; Ford v. McComb, 12 Bush 723; Franch v. Vining, 102 Mass. 132. (8) The Statute of Frauds will not be so construed as to aid a party in the perpetration of a fraud; its design was to prevent fraud, and it cannot be converted into an instrument of fraud. Rose v. Bates, 12 Mo. 30; Damschoeder v. Thies, 51 Mo. 100; Gillispie v. Stone, 70 Mo. 506; O'Fallon v. Clopton, 89 Mo. 287; McNew v. Booth, 42 Mo. 190; Turner v. Johnson, 95 Mo. 431; Leahy v. Witte, 123 Mo. 207; Richardson v. Champion, 143 Mo. 538. (9) Where a literal interpretation leads to unreasonable or unjust consequences, and an intention to enact a reasonable and just statute may be fairly inferred, the court will adopt the construction that will avoid the objectionable and unjust consequences. State ex rel. v. Rambauer, 104 Mo. 619; Kane v. Kansas City, 112 Mo. 34; Bowers v. Smith, 111 Mo. 45; Lamar Water Co. v. Lamar, 128 Mo. 188, 140 Mo. 145.

*David Goldsmith* for respondents.

GANTT, J.—Plaintiff brought this action in the circuit court of St. Louis against the defendants, Edward W. Rawlings, T. S. Teuscher and Mrs. T. S. Teuscher, for damages for false and fraudulent representations concerning the financial standing of T. S. Teuscher, upon which plaintiff alleges she acted and relied, to her detriment and damage. The petition contained two counts. The first count alleges that the defendants falsely and fraudulently represented to the plaintiff in November, 1896, that the said T. S. Teuscher was worth the sum of ten thousand dollars over and above all liabilities, was solvent and in good credit, and safe to be trusted for a loan of five thousand dollars; that relying on said representations the plaintiff loaned said Teuscher the sum of five thousand dollars, and took for the loan Teuscher's note payable one year after date with interest at the rate of six per cent per annum. The petition then alleges that each year thereafter until November, 1901, inclusive thereof, the said loan was extended for one year at the same rate of interest, and that at the date of each extension, the same representations were made by the defendants and relied on by the plaintiff, these allegations being relied upon after each extension separately. It is further alleged in the first count that at the date when the loan was made and at the time of each renewal thereof, Teuscher was insolvent and this was well known by the defendants and designedly concealed; that Teuscher has wholly failed to pay the loan or any part thereof, excepting that the interest was paid thereon up to the seventeenth of May, 1902. The second count refers to the same loan, and alleges a combination and conspiracy between the defendants to defraud the plaintiff and in furtherance thereof sets forth that Teuscher and wife, who were the brother-in-law and sister of the defendant, Rawlings, made various representations

to plaintiff concerning Teuscher's solvency and means, which are set forth specifically and are substantially the same as those alleged in the first count and added that Teuscher was willing to borrow the five thousand dollars from plaintiff as a favor to her; that in furtherance of this conspiracy the defendants Teuscher and Rawlings caused the wife of Teuscher to induce the plaintiff to come up to a meeting at the residence of Teuscher, it being known that plaintiff reposed special trust and confidence in the defendant Rawlings; that it was arranged between the said conspirators that at this meeting Rawlings should sanction and endorse the statements and representations of Teuscher, and represent himself to be acquainted with Teuscher's financial condition; that, in furtherance of the conspiracy, Rawlings did make certain representations which were substantially the same as those set forth in the first count of the petition; that plaintiff relied upon these representations and made the loan, and, in reliance thereon, also renewed the loan annually as stated in the first count.

At the beginning of the trial and before any evidence was introduced, the defendant moved the court to require plaintiff to elect upon which of the several causes of action alleged in the first count, she would proceed; and the court sustained this motion and plaintiff elected to proceed on that portion of the first count which related to the last extension, namely, the extension from November 17, 1901, to November 17, 1902, and the false representations relief upon by the plaintiff in the making of the renewal. While that election was made the plaintiff introduced evidence, both in regard to the original transaction and the various renewals. At the close of the plaintiff's evidence, the defendant asked an instruction in the nature of a demurrer to the evidence, which the court gave and thereupon the plaintiff took a nonsuit with leave to move

to set the same aside, and having filed this motion it was overruled, and the plaintiff appeals to this court. The plaintiff dismissed as to the defendant Teuscher and there was no evidence tending to establish a case against Mrs. Teuscher, so that the defendant Rawlings is practically the only defendant on this appeal.

The evidence tended to establish that Mrs. Knight, the mother of the plaintiff, and Mrs. Rawlings, the mother of defendant Rawlings, were old acquaintances and friends; that, in the year 1896, the plaintiff and her two sisters became entitled to an inheritance in England, the share of each being $5,265, the proceeds of which were forwarded to them and were received by them on October 28, 1896; that Rawlings, the defendant, who was then a clerk in the employ of Whittaker & Hodgman, assisted the plaintiff and her sisters in the collection and depositing of these funds in the National Bank of Commerce of St. Louis; that the elder sister took charge of her share of the funds, but the plaintiff and the other sister deposited theirs at the National Bank of Commerce in their respective names; that the defendant Rawlings advised them not to invest their funds until after the November election, 1896; that on November 11, 1896, Mrs. Teuscher, in the course of a social visit to Mrs. Knight, the mother of plaintiff, inquired whether the plaintiff and her sister had invested their funds and when informed that this had not been done, seemed surprised; that on the next day, Mrs. Teuscher in the course of another visit, mentioned that she had spoken of the matter to Mr. Teuscher, her husband, and he had expressed his willingness to borrow the money from the plaintiff and her sister; that Mrs. Knight, who had acted for her daughters in this matter, informed Mrs. Teuscher that the consent of the defendant Rawlings would be necessary; that nothing further transpired until November 16,

205 Sup—27

when Mrs. Teuscher called again and arranged that
the plaintiff's mother and sister should call at her
residence that evening; that, when these ladies called
that evening, the defendant Rawlings was present and
Teuscher stated that he had life insurance amounting
to sixty thousand dollars, was building a distillery at
Vincennes, and had a splendid business in St. Louis,
and that if anything happened to him Mr. Rawlings
would have charge of his affairs and would see that
they were protected. The testimony for the plaintiff
also tended to show that she had never been in a bank
prior to the deposit of this money and did not know
how to draw a check; that defendant Rawlings wrote
out the check and directed them how to sign their names
and in this way they drew sixty-five dollars for their
present needs. Plaintiff's sister, Miss Alice Knight,
was asked, "Now I will ask you to state what repre-
sentations and statements as to what Mr. Teuscher had
stated and as to his solvency at that time Mr. Rawlings
made on that occasion?" To this question defendant
objected unless such representations were in writing
and the court sustained the objection, to which action
of the court the plaintiff at the time excepted. The
witness was then asked, "State whether after you left
the house if any statement, and when you went to the
car, before you got on the car to go home, after you
had had this conference with the three parties about
loaning the money, whether Mr. Edward Rawlings
made any statements to you and your mother as to
whether he had investigated the financial condition of
Mr. Teuscher?" Ans. "Yes, Mr. Rawlings." "Coun-
sel for defendant, do not answer." To this question
the defendant objected upon the same ground as above,
which objection the court sustained, and the plaintiff
excepted. Witness was asked further, "What was the
agreement and understanding between you, your
mother and Mr. Teuscher and Mr. Rawlings as to loan-

ing this money on that occasion?'' Which question
was objected to for the same reason as above and the
court sustained the objection, and plaintiff excepted.
Witness further testified that the defendant Rawlings
on that occasion told them that the next morning they
should come down to Teuscher's office and sign a paper.
He did not state what the paper was or would be;
that on the next morning, the seventeenth, they went
to Teuscher's office and signed a paper, which she
afterwards learned was a check for five thousand dol-
lars. She further stated that on the evening before
when the defendant Rawlings had arranged every thing
and said every thing was all right, that their money
would be safe, she asked if she should sign a paper
so as to know they had the money and he replied that
that was not necessary, that every thing would be all
right. She identified the checks dated November 17,
1896, of the Bank of Commerce for five thousand dol-
lars each, and stated that the checks were in the hand-
writing of Mr. Rawlings and were already filled out for
her and her sister to sign; that she did not know what
the paper was that she was signing, but acted under
Mr. Rawlings' directions. That the notes were made
by Teuscher and that she did not see them, Rawlings
kept both the principal and interest notes; that Raw-
lings took charge of the notes and collected the interest
on them and sent it to them at Minneapolis; that they
went to live in Minneapolis in May, 1897; that on the
seventeenth of November, 1897, the note was renewed
for another year. Rawlings attended to the renewal.
On October 1, 1897, before the first notes matured,
defendant Rawlings wrote to Mrs. Knight, the mother of
plaintiff; among other things as follows: ''Regarding
the Teuscher loan, which matures November 17 next,
please direct me whether you wish the same extended
for one year at the same rate of interest.'' Under date
of November 5, 1897, Mrs. Knight instructed Rawlings

to renew the note for another year.   After this renewal Rawlings continued to collect and remit the interest until some time between June and October, 1898, when it appears that such remittance of the interest by Rawlings ceased and that direct remittance by Teuscher commenced. In the letter dated November 1, 1898, Rawlings wrote to Mrs. Knight in relation to the second renewal as follows: ''The Teuscher loan will mature the seventeenth of this month and I write to ask whether you desire me to renew the same for you at the same rate of interest, if you so wish it, I think I can arrange with Mr. Teuscher. I will await your reply before taking any further action in the matter.'' On December 15, 1899, the defendant Rawlings transmitted to Mrs. Knight the principal and interest notes given for the renewal made in November, 1899, and in that letter Rawlings stated: ''The Messrs. Teuscher will remit you direct and as the notes are paid you can cancel them and send them to their address.'' This appears to have ended the connection of Rawlings with the renewals, but on September 8, 1900, Rawlings after referring to the receipt of a letter from Mrs. Knight, wrote to her concerning an insurance policy, which it would appear Teuscher had promised to turn over to Mrs. Knight as collateral security and in that letter said: ''I have your letter of the 4th inst., and have carefully noted contents. I have to-day seen Mr. Teuscher and he promises to deliver to me on next Monday the policy mentioned. He also states he will write you fully next week with the view of taking up the loan if you so desire. He has been a very busy man, hence acknowledges he has not given your matter the attention it demands. There is absolutely no necessity for you to come here, and I shall promptly advise you when the policy is in my care. I cannot help but believe your loan is perfectly secure as Mr.

Teuscher is strictly honest and a young man with brilliant prospects.''

The witness was asked to state whether or not the loan was renewed from time to time on the faith of statements of Mr. Rawlings contained in any of these letters, to which counsel for the defendant objected on the ground that there was no evidence of such statements contained in the letters. Which objection the court sustained and plaintiff excepted. The loan was renewed the last time November 17, 1901, and matured November 17, 1902, and the note was never paid by Teuscher. Witness further stated that no policy of insurance was ever turned over to her or to her sister, the plaintiff, after the loan was made. They supposed it had been transferred to them and was being held by Mr. Rawlings as security for the loan as a part of the original understanding. She further stated they had never made any investigation as to the solvency of Mr. Teuscher, because they had relied implicitly upon Mr. Rawlings. Upon the motion of the defendant the court excluded the evidence of the witness as to plaintiff relying upon Rawlings, to which action of the court the plaintiff excepted. She further stated that the services rendered to her and her sister in these matters by Mr. Rawlings were without any compensation.

The plaintiff in her own behalf testified and gave the same account of the transactions as above detailed by her sister. She added, however, that when the loan was made an insurance policy on the life of Mr. Tuescher was to be issued to them to secure the same. This policy was supposed to be issued for sixty thousand dollars. The policy was not taken out until the seventeenth of April, 1899, and was for ten thousand dollars. On June 6, 1902, she was in St. Louis and made some investigations as to whether the policy had been taken out. Teuscher had not been paying the

interest promptly, and they had written and telegraphed Mr. Rawlings, but could not get any satisfaction. She asked Mr. Rawlings about the policy and he first said he did not know anything about it. She asked him if he had the policy and he replied, "Yes," but that it was at his home and that he would mail it to her at Minneapolis. She asked him if the premiums had been paid and he said he did not know anything about it and referred her to Teuscher. She then went to the insurance office and was told that the first premium only had been paid and the subsequent ones had not been and the policy was not worth the paper it was written on. She then got the policy and that was the first time she ever saw it. She identified the letter of September 10, 1900, from Rawlings to her mother stating that Teuscher had at that time or date deposited with him a policy in the New York Life for ten thousand dollars and he had placed the same in the safe deposit company for safe keeping, and to her credit, and stated that she had better hold his letter as a receipt. Plaintiff also identified a letter dated November 8, 1897, from Rawlings to her mother in which he stated, "I am having the loan extended for one year at the same rate of interest, the security being the life insurance policy as he informed you at the time the loan was made." Plaintiff further stated that at the time the loan was made, a close relation of friendship existed between Mr. Teuscher and Mr. Rawlings; that about three months, to-wit, in February, 1897, after the loan was made, the Mullanphy Bank in the city of St. Louis failed. The matter of the failure was published in the newspapers and was commented on as an important failure; that these comments of these papers were read by the plaintiff and that the newspaper reports stated that Teuscher was the principal debtor of that bank and was the cause of the failure; that plaintiff and her sister paid no attention to these reports be-

cause they did not believe Teuscher was responsible for the failure, owing to their trust in Mr. Rawlings; that Rawlings sent a message to her mother by his mother that they should not be worried about the matter. The defendant moved to strike out this part of the plaintiff's answer, and it was sustained and plaintiff excepted.

Mrs. Harriett Knight, the mother of the plaintiff, stated that she had known Mr. Rawlings over thirty years and the relations between them had been intimate during that time; the two families lived for quite a time in the same house and this relation continued up to November, 1896. She corroborated the statements of her daughter as to what occurred at the house of Mrs. Teuscher when it was agreed the loan should be made. She was asked also as to what oral representations Rawlings made on that occasion as to the credit and solvency of Teuscher, to which questions the defendants objected, and the objections were sustained and exceptions saved.

Manton Davis testified for plaintiff that he was a member of the bar of St. Louis and represented the receiver of the Mullanphy Bank since its failure; that Teuscher was indebted to the bank to the amount of two hundred thousand dollars, evidenced by notes; that he had made repeated efforts to collect these notes and had failed to do so; that these notes were all dated prior to September, 1896. This is practically all the evidence in the case.

I. Upon the case made, the circuit court held that section 3422, Revised Statutes 1899, which provides: "No action shall be brought to charge any person upon or by reason of any representation or assurance made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance be made in writing, and subscribed by the party to be charged thereby, or by some person

thereunto by him lawfully authorized," was a complete
bar to plaintiff's recovery, and the propriety of this
ruling presents the question for solution at this time.
The Statute of Frauds (29 Car. II) did not contain
the provision which now forms the subject of section
3422, Revised Statutes 1899, but with regard to the
liability for the debts of others contained only the pro-
vision found in section 3418, to-wit: "That no action
shall be brought to charge any person upon any special
promise to answer for the debt, default or miscarriage
of another person, . . . unless the agreement upon
which the action shall be brought, or some note or
memorandum thereof, shall be in writing and signed
by the party to be charged therewith, or some other
person by him thereto lawfully authorized." The first
instance in which an action of tort for a misrepresenta-
tion respecting the ability of a third person was solemn-
ly adjudged to be maintainable is found in the case
of Pasley v. Freeman, 3 T. R. 51, decided by Lord
KENYON, C. J., and ASHURST, J., and BULLER, J., against
the opinion of GROSE, J. in 1789. In that case GROSE,
J., in his dissenting opinion, said: "And even in this
very case, if the action lies, the plaintiffs will stand
in a peculiarly fortunate predicament, for they will
then have the responsibility both of Falch and the
defendant. And they will be in a better situation than
they would have been if, in the conversation that passed
between them and the defendant, instead of asserting
that Falch might safely be entrusted, the defendant
had said, 'If he do not pay for the goods, I will,' for
then undoubtedly an action would not have lain against
the defendant." Lord ELDON, in Evans v. Bicknell,
6 Ves. Chan. l. c. 184 and 187, discussed Pasley v. Free-
man, saying: "It is almost improper at this day to
say anything having a tendency to shake it; but I know
Mr. Justice GROSE very lately held the same opinion as
he did at the time of the judgment. The doctrine laid

down in that case is in practice and experience most dangerous. I state that upon my own experience; and if the action is to be maintained in opposition to the positive denial of the defendant against the stout assertion of a single witness, where the least deviation in the account of the conversation varies the whole, it will become necessary, in order to protect men from the consequences, that the Statute of Frauds should be applied to that case. Suppose, a man asked, whether a third person may be trusted, answers, 'You may trust him; and if he does not pay you, I will.' Upon that the plaintiff cannot recover; because it is a verbal undertaking for the debt of another. But if he does not undertake, but simply answers, 'You may trust him; he is a very honest man, and worthy of trust,' etc., then an action will lie. Whether it is fit the law should remain with such distinction, it is not for me to determine." And then he adds: "Upon the case of Pasley v. Freeman I have always said, when I was Chief Justice, that I so far doubted the principles of it, as to make it not unfit to offer, as I always did, to the counsel, that a special verdict should be taken; but that offer was so uniformly rejected that I suppose I was in some error upon this subject. I could therefore only point out to the jury the danger of finding verdicts upon such principles; and I succeeded in impressing them with a sense of that danger so far that the plaintiffs in such actions very seldom obtained verdicts." And he added further: "It leads to the absolute necessity of affording protection by a statute, requiring that these undertakings shall be in writing." Lord Eldon's opinion of the wisdom of the decision in Pasley v. Freeman met with so much favor that on May 9, 1828, Parliament enacted the statute 9 Geo. IV, c. 14, commonly known as Lord "Tenterden's Act," and made the same a new section to the English Statute of Frauds, of which our statute, section 3422, is to all in-

tents and purposes a copy, except that the English stat-
ute contains a provision restricting its application to
representations concerning the character, condition,
etc., of any other person made with the intent or pur-
pose that such other person should obtain money or
goods upon the credit thereof. Of the purpose of Lord
Tenterden's Act, it is said in a review of Chandelor v.
Lopus, 2 Croke 4; 1 Smith's Leading Cases, 319, "It
was in order to prevent the Statute of Frauds from
being thus trenched upon that the Legislature enacted
what is commonly called Lord Tenterden's Act." In
Savage v. Jackson, 19 Ga. l. c. 309, 310, in discussing
Pasley v. Freeman, it was said by the Supreme Court
of that State: "Finally, Parliament, after allowing
the decision to stand long enough to show the sort of
fruit it would bear, laid the axe to its root. In the
9th year of George IV, under the auspices of Lord
Tenterden, Parliament passed an act containing these
words [here quoting the statute and adding], "this was
done, says Smith, to prevent the Statute of Frauds
from being trenched upon by this decision in Pasley
v. Freeman." In Weil v. Schwartz, 21 Mo. App. l. c.
385, Philips, P. J., said, in reference to Lord Tenter-
den's Act, "The history of the first enactment of this
statute by the English Parliament furnishes most per-
suasive proof that its design and purpose were to cut
up by the roots the great evil of the frequency and
success of such actions, based on mere loose verbal rep-
resentations, by requiring the action to depend exclus-
ively on the written undertaking, duly signed by the
party sought to be held." See Lyde v. Barnard, 12
N. & W. 101; Savage v. Jackson, 19 Ga. 305. As said
by Benning, J., in the case last mentioned, "When a
statute says that a promise to answer for a debt of
another shall not bind, does it not say that anything
less shall not bind?" Browne on Statute of Frauds
(5 Ed.), sec. 181, pp. 226, 228, after stating that since

the case of Palsey v. Freeman it has been considered, both in England and in this country, that the original Statute of Frauds does not apply to false and deceitful representations as to the credit or solvency of third persons, commends the doctrine of that case as a firm stand against actual frauds and cheats, but adds: "At the same time it comes dangerously near to the invasion of the statute which was wisely designed to prevent them; and accordingly it has been strongly condemned by Lord ELDON. Impelled by that consideration, Parliament enacted what may be called a supplement to the Statute of Frauds," known as "Lord Tenterden's Act." "The plain meaning of this statute seems to be that it requires writing to charge a defendant upon *any* representation made in regard to the credit, etc., of a third party, whether the representation was made in good faith, or was known to be false and was made in order to deceive and defraud the plaintiff; because the presence of this element of intention to deceive and defraud was the very point on which Pasley v. Freeman held that the Statute 29 Car. II did not apply; and the purpose of the Tenterden Act was to require a writing in a case for which 29 Car. II had failed to do so." In 14 Am. and Eng. Ency. of Law (2 Ed.), 33, under the title "Fraud and Deceit" it is said: "Some courts have held that the statute does not apply to cases of actual fraud; that is, cases in which the representation is not only false, but is made with a fraudulent intent. The better opinion, however, is to the contrary, for there is no such restriction in the statute." In Cook v. Churchman, 104 Ind. l. c. 146, 147, et seq., the Supreme Court of Indiana discusses this whole question, and after a review of Pasley v. Freeman and Lord Tenterden's Act and the American decisions on similar statutes in this country, says: "That the complaint contains averments charging a conspiracy cannot affect the question. The purpose

of the statute cannot be disappointed by the form of the complaint. The necessity that the representations should have been made in writing is the same, where a conspiracy is set up and where it is not. When the action is to recover damages for false representations made by a stranger to a contract concerning any of the subjects enumerated in the statute, it must fail, unless the representations were made in writing, duly signed, etc. This must be so, whether the representations were made as a result of a conspiracy, and with intent to perpetrate a fraud, or otherwise." And to the same effect will be found Kimball v. Comstock, 14 Gray 508; Brown v. Kimball, 84 Me. 280; Hunter v. Randall, 62 Me. 423; Bates v. Youngerman, 142 Mass. 120; Hunnewell v. Duxbury, 157 Mass. 1.

Counsel for plaintiff among other cases cite Bush v. Sprague, 51 Mich. 41, as supporting their contention that the statute does not apply to conspiracies or actual frauds. But an examination of that case will show that counsel have quoted from the opinion of CAMPBELL, J. On the contrary, the Chief Justice, in discussing this section of the Statute of Frauds and the occasion of its passage, in connection with the decision in Pasley v. Freeman, said: "It is therefore obvious that a charge of conspiracy to defraud by false representations will not disappoint the statute. Neither the reason nor the language of the provision will exclude a case on account of the number of wrongdoers, or in consequence of their having acted on a previously concerted plan." And Judge COOLEY, the remaining member of the court, said: "I agree with the Chief Justice in the view he takes of the application of the Statute of Frauds to this case." The other case, Hess v. Culver, 77 Mich. 598, has no bearing upon the question under consideration. It simply held that the statute does not apply to a conspiracy or actual fraud where the representation is made to enable the party

making it to profit by it. And the later case of Bank v. Steel, 135 Mich. 165, shows that that court construes the statute in accordance with the great weight of authority as shown in the cases cited.

We come now to the case of Warren v. Barker & Co., 2 Duv. (Ky.) 155, relied upon by the plaintiff as holding a contrary view to the decisions in Massachusetts, Indiana and Maine. The Kentucky statute, section 1, page 22, Stanton's Revised Statutes, page 264, then in force, was to all practical effects the same as the Tenterden Act of England. As said by Chief Justice STONE in Ball v. Farley, Spear & Co., 81 Ala. 1. c. 293, that case is meagerly reported, but enough is shown to give a correct understanding of the principles declared. Barker and Company had introduced a man to Warren, who offered a bill of exchange for sale, which was apparently indorsed to the offerer. Warren purchased the bill, and it turned out to be a forgery. The decision of the court, and the language in which it is expressed, force the conclusion that there was an entire absence of proof of combination or collusion between Barker & Company, and the man introduced. The report contains only the opinion of the court, and the following is the summation of the facts as therein shown: "The appellant, Warren, sued the appellees, Barker & Company, for a false and fraudulent introduction to him, as an exchange banker, of an impostor, holding, as apparent indorsee, a forged bill offered for sale, and which, on the faith of that recommendation, he was induced to buy." The trial court sustained a demurrer to the petition. An amendment was then offered and allowed, charging a fraudulent combination between Barker & Company and the seller of the bill. The trial court peremptorily instructed the jury to find for the appellees, Barker & Company, which they accordingly did. Judge ROBERTSON, speaking for the Court of Appeals in pronouncing on the de-

murrer to the petition as first framed, said the primary court "seemed to be of the opinion that, according to the first section of chapter 22 of Stanton's Revised Statutes, p. 264, even a fraudulent representation, without written evidence of it, would not be actionable." The circuit court held there was no testimony of a fraudulent combination and the Court of Appeals held that the trial court did not err in so instructing the jury. The Court of Appeals further said: "Nor will a majority decide that there was error in sustaining the demurrer to the original petition, charging or attempting to charge, a fraudulent misrepresentation. A false representation may not be fraudulent in intent; for, although it may be constructively, it is not actually fraudulent to affirm absolutely as true that which the asserter believes to be true. The *malus animus* is the essential and distinctive element of actual fraud. Had the original petition intended to charge only a false representation, the appellees would not be suable for it. . . . Our statute, like the Tenterden Act of England, should be construed as embracing every false representation *untinged by a fraudulent intent*; but it does not constructively include any case of actual fraud in wantonly misrepresenting a man's credit or identity, more than any other kind of fraud in fact. Written evidence is not, therefore, required by our statute, if the petition be sufficient to charge actual fraud." And in this case, the judgment was affirmed. It will be noted that Chief Justice ROBERTSON did not dissent from the views of the other members of the court that a mere false representation is within the Statute of Frauds, and not suable unless evidenced in writing. It will be noticed that the Court of Appeals of Kentucky says that the Kentucky statute "like the Tenterden Act of England, should be construed as embracing every false representation *untinged by a fraudulent intent*, but does not constructively include any

case of actual fraud,'' etc.   We think it is a fair infer-
ence that the court held that such was the construction
of the Tenterden Act in England, and if so it was sure-
ly an error, because, at that time, the Tenterden Act
had been construed by the English courts to the con-
trary.   Thus, in Devaux v. Steinkeller, 6 Bing. N. C.
84, the court held that a false representation knowing-
ly made concerning a firm by one of its members was
within the purview of the statute.   And in Haslock v.
Fergusson, 7 A. & E. 86, Lord DENMAN, C. J., speaking
for the court of King's Bench, said: ''The question in
this case was, whether the representation which it was
proposed to give in evidence came within 9th Geo. 4,
c. 14, sec. 6, so as to be inadmissible unless in writing.
It is suggested, on the part of the plaintiff, that the
representation was fraudulent, and that the defendant
caused it to be made for the purpose of fraud.   The
case does not appear to us to raise any doubt in point
of law.   The question is, whether the action is brought
according to the terms of the statute.   .   .   .   Such,
then, being the question, the plaintiff says that the
action is not upon the representation, but for money
had and received; that the representation is a mere
medium of proof, the case being that a fraud was com-
mitted, in the course of which this representation was
made, and that the produce of the goods obtained by
such fraud belongs to the plaintiff.   But the only fact
on which the case of fraud rested at the time of offer-
ing the evidence was that the defendant had authorized
Hobson to give Mrs. Barnes a fair character.   We
think that a representation made under those circum-
stances is within the very terms of the 6th section of
statute 9 Geo. 4, c. 14, and therefore could not be re-
ceived in evidence, unless put into writing.''   And to
the same effect is Swan v. Phillips, 8 A. & E. 457
(1838).   So that if the Court of Appeals of Kentucky
was of the opinion that the English courts had so con-

strued the Tenterden Act we respectfully submit they were mistaken. In Dent v. McGrath, 3 Bush (Ky.) 174, the Court of Appeals of Kentucky approved what has been said in Warren v. Barker & Company, supra. And to the same effect is Clark v. Dunham Lumber Company, 86 Ala. 220, in which it is said: "No representation made by the defendant as to the character, conduct, ability, trade or dealings of a third person, even though false, can be made a basis of an action unless reduced to writing and signed by the party sought to be charged, or unless it is fraudulently made." And to the same effect is Ewins v. Calhoun, 7 Vt. 79. As to the last-mentioned case, however, which was decided in 1835, we have not been able to discover that Lord Tenterden's Act had been adopted at that time and if not then of course Pasley v. Freeman would have been a precedent for the court. As was the case in Upton v. Vail, 6 Johns. 181, as the Tenterden Act has never been adopted by New York.

Section 3422 was first adopted in this State March 15, 1845. [R. S. 1845, p. 531.] The annotator of that revision remarks: "This section is borrowed from the English code where it was first enacted in the 9th year of George IV. It has been adopted in the late Revised Statutes of Massachusetts, and Chancellor Kent, speaking of it, says: 'It wonderfully relieves the courts, the profession and the country, from the evils of fluctating and contradictory decisions.' [2 Kent's Com., 489, in note.]"

This court had occasion in Clark v. Edgar, 84 Mo. 106, to comment upon this section, and Judge BLACK said in passing upon a demurrer to the petition: "A further objection is that the representations were not made in writing, subscribed by the defendants, or any one authorized so to do by them. This objection is based upon section 2515, Revised Statutes 1879, which differs in no material respect, so far as this case is con-

cerned, from that of 9 Geo. 4 chap. 14, sec. 6.   This stat-
ute is regarded as a supplement to the Statute of
Frauds, and has been adopted by a portion only of the
states of this Union.''   After quoting the section in
full, he says:  "It was considered in McKinney v.
Whiting, 8 Allen 208; Wells v. Prince, 15 Gray 562;
Kimball v. Comstock, 14 Gray 510; see, also, Devaux
v. Steinkeller, 6 Bing. N. C. 84, 3 Jur. 1053.   We are
not to go beyond the express terms of the statute in its
application.   [Medbury v. Watson, 6 Metc. 246; Nor-
ton v. Huxley, 13 Gray 285.]   If *written* representa-
tions are the substantial inducements, recovery can be
had, although some reliance may be placed upon oral
assurances.   [Tatton v. Wade, 18 C. B. 371.]''

Now it is familiar doctrine that when the statute
of another State or country is adopted by the Legisla-
ture of this State, the construction placed upon that
statute prior to its adoption in this State, will be pre-
sumed to have met the approval of our Legislature
when adopting it.   We have seen that Lord Tenter-
den's Act was enacted in 1828, and that the courts of
England had prior to 1845 expressly ruled that a false
representation as to the credit of another would not
take the case out of that act.   And considering the pur-
pose of that act and the causes which led to its adop-
tion, particularly the case of Pasley v. Freeman and the
great weight of authority in this country, we are in-
clined to the opinion expressed by Browne in his
work on the Statute of Frauds, and hold that the plain
meaning of this statute is that it requires a writing to
charge a defendant upon any representation made in
regard to the credit, etc., of a third party whether such
representation is made in good faith, or is known to
be false and made in order to deceive and defraud the
plaintiff, because the presence of this very element of
intention to deceive and defraud was the very point

205 Sup—28

upon which the court in Pasley v. Freeman held that the Statutes of Frauds of 29 Car. II did not apply.

The plain purpose of Lord Tenterden's Act was to require a writing in a case for which 29 Car. II had failed to provide, and to sustain the contention of the plaintiff in this case we must go back to Pasley v. Freeman and ignore the statute, section 3422, Revised Statutes 1899, which was enacted to remedy the ruling in that case. To do that we must import an exception into the statute, a restriction and exception which its language does not justify.

Accordingly, it must be held that the circuit court committed no error in rejecting the offers to prove the oral representations of the defendant Rawlings, as to the solvency and credit to which Teuscher was entitled. And we are wholly unable to agree with counsel that the defendant can be held liable for misrepresentations without knowledge of their falsity and that the statute does not cover any case for which a liability would exist at common law. To reach such a conclusion we must disregard the statute entirely. As to the evidence on the part of the plaintiff and her sister as to why they did not make other inquiries and that the defendant Rawlings stood in a confidential relation to the plaintiff, we are of the opinion that the defendant did not sustain any such relation within the meaning of the law. He was at most but a friend of the family and received no compensation whatever for his acts in assisting them in collecting and depositing their money.

Our conclusion is that the circuit court committed no error in rejecting the evidence, and that the statute is a complete bar to plaintiff's action, and accordingly the judgment must be and is affirmed.

*Fox, P. J.*, and *Burgess, J.*, concur.