GEORGE JECK v. C. E. O'MEARA and CHEVROLET MOTOR COMPANY, Appellants.—122 S. W. (2d) 897.

Division One, December 20, 1938.

*McCarthy, Morris, Smith & Sparrow* for appellants; *Warren E. Talcott* of counsel.

*Thompson, Mitchell, Thompson & Young, Richmond C. Coburn, R. Forder Buckley* and *White, White & White* for respondent.

564

BRADLEY, C.—This is an action for alleged fraud and deceit, and was tried to a jury. The verdict was for plaintiff and against defendants, assessing actual damages at $14,000, and punitive damages at $10,000, and judgment went accordingly. Motion for new trial was overruled and defendants appealed.

Error is assigned (1) on the refusal, at the close of the case, of defendants' separate instructions in the nature of a demurrer to the evidence; (2) on instructions given for plaintiff; (3) on the refusal of certain instructions requested by defendants; (4) on alleged defect of parties plaintiff; (5) on the admission of evidence; (6) that there was no evidence to support punitive damages; and (7) on an alleged excessive verdict.

This is the second appeal in this cause. [See Jeck v. O'Meara et al., 341 Mo. 419, 107 S. W. (2d) 782.] At the first trial plaintiff had verdict for actual damages in the sum of $15,775.67 and for punitive damages in the sum of $10,000. The actual damages verdict included interest in the sum of $1775.67. At the first trial, the court required a *remittitur* of $2500 from the punitive damages. On the second trial no interest was sought and no *remittitur* of punitive damages required. No change was made in the pleadings at the second trial. In the former opinion we stated the substance of the petition and make reference to that opinion for a fuller statement as to the petition. The answer was a general denial. We here give, in part, our former statement relative to the petition.

"Plaintiff alleged that the Chevrolet Motor Company of St. Louis was engaged in the manufacture, sale, and distribution of Chevrolet cars in St. Louis, and that said company was the sole and exclusive manufacturer and distributor of such cars in St. Louis, and Missouri generally; that defendant, O'Meara, was in the employ of said company as its zone manager in St. Louis, and other parts of Missouri and part of Illinois; that as such zone manager, O'Meara 'was authorized, or held himself out to be authorized, to be in charge of

all sales to retail dealers engaged in selling' Chevrolet cars in his zone and that O'Meara was authorized, or held himself out to be authorized, to control and supervise all retail Chevrolet dealers in his zone; that all retail dealers in said zone had to have what is called a franchise from the Chevrolet Motor Company of St. Louis, in order to handle Chevrolet cars, and that such franchise was issued only upon the approval and recommendation of O'Meara, the zone manager; that by virtue of said franchise, supervision, control, etc., maintained by O'Meara as zone manager, the defendant Chevrolet Motor Company, the General Motors Holding Company, Motors Accounting Company, all belonging to the General Motors group, supervised and controlled the sales, distribution, finances, advertising, business policy, management, accounts, bookkeeping system, etc., of all licensed retail dealers handling Chevrolet cars within said zone, and that included among the retail dealers so supervised, etc., was the Lindell Chevrolet Company, a retail dealer of Chevrolet cars, at 3949 Lindell Boulevard, St. Louis; that the Lindell Company had been engaged in selling at retail, Chevrolet cars and parts, under a franchise from the defendant, Chevrolet Motor Company, for some time prior to June 15, 1931; that shortly prior to said date, O'Meara, for himself and as zone manager for the defendant, Chevrolet Motor Company, for the purpose of inducing plaintiff to invest $15,000 in the capital stock of the Lindell Chevrolet Company, false and fraudulently represented to plaintiff.'' Then follows eleven specifications of fraud.

At the first trial, plaintiff went to the jury on the charges of fraud pleaded in eighth and ninth specifications. (See former opinion 107 S. W. (2d) l. c. 783-4).

We ruled on the former appeal that the alleged false representations submitted were promissory, that is, related to the future, and not to past or existing facts. At the second trial, plaintiff went to the jury on the second alleged false representations only, and phrased in plaintiff's instruction as follows: ''That the said Lindell Chevrolet Company was solvent and in good financial condition.''

Defendants say that the demurrer to the evidence should have been sustained because of the Statute of Frauds (Sec. 2970, R. S. 1929, Mo. Stat. Ann., sec. 2970, p. 1858); that there was no substantial evidence tending to show that the Lindell Chevrolet Company was insolvent when plaintiff purchased the stock; and because it is claimed that there was no evidence tending to show the value of the stock when plaintiff purchased, and therefore no evidence upon which to measure damages.

The Lindell Chevrolet Company was organized in October, 1930, by A. D. Speilberg. Capital stock was to be $50,000. Speilberg and W. M. Venner together, had $25,000 in stock (whether jointly does

not appear), and Jerome Benjamin $10,000. The remaining $15,000 was not subscribed. Benjamin put in cash, but.part of what Speilberg and Venner put in was equipment, of what value does not appear. June 15, 1931, plaintiff invested $15,000 in this stock, receiving 150 shares of preferred and 75 shares of common stock. December 23, 1931, bankruptcy proceedings were commenced against the company and it was adjudged a bankrupt February 13, 1932. The creditors received only 7 per cent on their claims, and plaintiff's investment was a total loss. However, he received $1000, which is explained hereinafter. Prior to making the investment plaintiff, for many years, had been engaged in mechanical service on automobiles, and at the time was employed by the Fred Campbell Auto. Company at a salary of $200 per month. He had had no experience in financing automobile companies or in dealerships. In the latter part of May, 1931, one Ross, an acquaintance of plaintiff, suggested to him that there was a "chance of getting in" at the Lindell Chevrolet Company. Ross and plaintiff went to the office of this company, and Ross introduced him to Speilberg, the president. On this occasion arrangements were made for a meeting the next evening and Speilberg said that he would have present at the meeting "some of the factory (defendant, Chevrolet Motor Company) representatives to explain and outline the situation." The next day at about seven-thirty P. M., the meeting was held at the office of the Lindell Chevrolet Company, and at the meeting were plaintiff and his attorney, Samuel White, O'Meara, zone manager for defendant Chevrolet Motor Company, a Mr. Jensen, city sales manager for that company, and Speilberg.

Plaintiff testified that Speilberg "started off the conversation by saying: "Mr. Jeck is a party that probably might be interested in this thing and he would like to hear what we have to offer, what it is all about." That he, plaintiff, then asked: "Well, now, just what investment does this take?" that Speilberg suggested $10,000; that he, plaintiff, then remarked that such sum was a lot of money for him; that O'Meara suggested $15,000. "Q. What did he (O'Meara) tell you about the condition of the Lindell Chevrolet Company, the dealership? A. Well, one thing brought on another, and Mr. O'Meara said that this was one of the leading metropolitan dealerships in the city of St. Louis, 'and you should do a good business. By investing fifteen thousand dollars, understand, the deeper you are in it the more returns you will get for your investment.' I said, 'Yes, that is very nice, providing everything goes all right.' (O'Meara) 'Well, it can't go wrong.' And with that Mr. White said, 'Well, what about an audit of the books?' He (White) said, 'I kept Mr. Jeck out of something once before by having books audited. I don't want to see him go wrong this time.' Mr. O'Meara said, 'that is a needless, useless expense. Our books are audited by the Motor Ac-

counting Company, one of our subsidiaries. Perpetually audited. I get a report every month showing just what each dealership is doing. I get detailed reports showing sales and stuff of that kind. . . . We have a report every day of the expenses and the sales, and no dealership can spend in excess of fifty dollars without the sanction of the factory—and that is me. Q. What else did he tell you, if anything, about the Lindell Chevrolet Company? A. He said, 'On top of that this company is in good sound financial condition and you can't lose a dime.' ''

Plaintiff made no decision at this first meeting; expressed his desire to talk the matter over with his wife, who did not sit in at this meeting, but was in a nearby room. Upon plaintiff failing to come to decision, and expressing the desire to think it over and talk to his wife, O'Meara, according to plaintiff, said to him: ''Well, don't make it too long now, because there is another party that wants to come into this thing if you don't.'' A few days after this meeting, another was held at the same place, and the same persons were present, and in addition Mrs. Jeck was present. At the second meeting plaintiff testified that he made it known that his wife had ''come down to hear all the details of the first meeting;'' and that ''the talk was along the same general lines'' as at the first meeting. At the second meeting the subject of plaintiff's salary, if he invested, was discussed, and he testified that O'Meara said that the salary would be $250 per month. Plaintiff made inquiry as to what job he would have, and that O'Meara said: ''You would fit in fine in the service department, or in the back end, reconditioning used cars. Your past experience in building automobiles and rebuilding automobiles would fit you in fine for that.'' Plaintiff says that he remarked that he was then getting $200 per month without an investment, and indicated that he thought he ought to have more than $250 per month, if he put in $15,000, and he says that O'Meara then said: ''Don't let the salary end worry you. We are going to cut down all the salaries. Don't let that worry you. It is the dividends what you are after and all what is going to count.'' Also, plaintiff testified that at the second meeting O'Meara said that the stock plaintiff was buying was worth ''every dime you are paying for it,'' and would ''be worth more than that later on.''

At the second meeting plaintiff definitely decided that he would invest, directed his attorney (White) to prepare the necessary papers. This was done and thereafter and on June 15, 1931, plaintiff paid to the Lindell Chevrolet Company $15,000, and received his stock. He did not go to work ''in the back end'' until July 1st, and his salary checks soon began ''to bounce back.''

Speilberg, White, Mrs. Jeck, The Lindell Company bookkeeper, and others were witnesses for plaintiff. Speilberg testified that at

the first meeting he introduced plaintiff to O'Meara and Jensen; that plaintiff "was wondering why this opportunity was ever presented to him," and that O'Meara "told him (plaintiff) the reason was that Mr. Benjamin was drawing a large salary ($400 per month) and was not contributing much to the operation of the business, and that *we* wanted to get him out of there, and that *we* wanted to get more capital into the business;" that White spoke about an audit of the books, and that O'Meara informed White that an audit "would be a needless and unnecessary expense, inasmuch as Motor Accounting had been into *our* office constantly since *we* had been opened, and that we had accurate records of what the financial standing of the Lindell Chevrolet was;" that the financial standing of the Lindell Chevrolet Company "was o. k.; that *we* were solvent and that *we* were doing a very nice business; that *we* were doing a larger business than *we* had capital to take care of." (Italics ours.)

White testified that O'Meara, at the first meeting, said that the financial condition of the Lindell Chevrolet Company "was good; that it was a solvent company;" that he suggested to O'Meara that before he (White) "would let Mr. Jeck invest $15,000, or any other sum, that I would demand that the books of the company be audited;" that O'Meara said that an audit was not necessary; that "the Motors Accounting Company make a monthly audit of the books, and in addition to that (defendants) get a daily report showing the status of every Chevrolet dealer in the City of St. Louis—in other words, he knew the following morning the status of every one of the dealers in his zone." White testified that O'Meara said that "it would cost something like four or five hundred dollars to audit those books," and that he said to Jeck "if the Motors Accounting Company are the auditors for the Lindell Chevrolet Company and the authorized auditors of the dealers in the zone, that I was satisfied it was a reliable company and that we could depend upon what Mr. O'Meara said with reference to the financial condition of the company and the status of the books;" that O'Meara said that plaintiff "would make a lot of money on the $15,000."

Mrs. Jeck testified that, at the second meeting, O'Meara said that "the company (Lindell Chevrolet Company) is solvent and in a safe, sound financial condition;" that "you can't possibly lose in this proposition at all. The business is watched by me very closely. We don't allow our dealers or agents to spend over $50.00 without our consent, and you can't lose a dime if you make this investment;" that she asked for an audit of the books, and that O'Meara said that an audit was not necessary; "that there was a perpetual audit;" "that he got a monthly statement and a daily report. And he said, 'the audit would cost you around four or five hundred dollars if

you made an audit of the books.' He said, 'I couldn't tell you these books were all right if they were not.' "

The record shows that the books of the Lindell Chevrolet Company, at the time plaintiff made his investment, were in bad condition. It is not necessary to detail. Also, the record shows that, at that time, the Lindell Chevrolet Company had a number of outstanding checks that had not cleared for want of funds and, as we understand the record, the company then had an overdraft of $7800 at the bank. After plaintiff paid in his $15,000 on June 15, 1931, the Lindell Chevrolet Company, within three days thereafter issued checks to defendant, Chevrolet Motor Company, totaling $12,002.92; and in the same period issued two checks to General Motors Acceptance Corporations, totaling $2274.36, and also a check for $2728.05 to the Motors Accounting Company. All these, as we read the record, were for existing debts of the Lindell Chevrolet Company when plaintiff invested, and there were other debts. There was substantial evidence tending to show that O'Meara knew the financial condition of the Lindell Chevrolet Company at the time he made the representations to plaintiff as to said company's solvency. Also, there was substantial evidence tending to show that, when O'Meara made the representations submitted, the Lindell Chevrolet Company was insolvent, and that he knew of the condition. That plaintiff and his attorney, White, were convinced by O'Meara's representations and relied upon them was certainly a question for the jury, and that plaintiff's investment was a total loss, except the $1000 is not questioned.

O'Meara was the only witness for defendants. He denied making the statements as to solvency attributed to him, and said that he told plaintiff that the books of the Lindell Chevrolet Company "were in an unsatisfactory condition."

■ "The gist of an action founded on fraudulent representations, when damage results, is the fraud of defendants, and when it appears that a representation is made which is known to be false at the time it is made, and the person to whom it is made relies upon it and is deceived thereby to his injury, an action lies against the party making it. Whenever the above facts are proven the fraud necessary to give a right of action appears, and the intention to deceive is sufficiently shown." [Dulaney et al. v. Rogers et al., 64 Mo. 201, l. c. 204. See, also, Becker v. Thompson et al., 336 Mo. 27, 76 S. W. (2d) 357; Boone County v. Cantley, 330 Mo. 911, 51 S. W. (2d) 56.] Defendants contend, in effect, that even though O'Meara made the alleged false representations submitted to the jury, and that plaintiff relied and acted thereon, to his damage, still he cannot recover, because the representation as to the solvency of the Lindell Chevrolet Company was not in writing. Section 2970, Revised Statutes, 1929 (Mo. Stat.

Ann., sec. 2970, p. 1858), provides that "no action shall be brought to charge any person upon or by reason of any representation or assurance made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance be made in writing, and subscribed by the party to be charged thereby, or by some person thereunto by him lawfully authorized."

This question (without discussion) was ruled adversely to defendants on the prior appeal, and we cite in support of our ruling Boyd v. Farmers Bank et al., 223 Mo. App. 442, 14 S. W. (2d) 6. In that case it is ruled (14 S. W. (2d) l. c. 8) that the statute does not apply "when the primary purpose of such representations was not to induce the extension of credit or delivery of money or goods to the persons concerning whom they are made, but to secure the execution of a contract to which the person making them is a party." And in Zeitinger v. Steinberg et al. (Mo. App.), 277 S. W. 953, l. c. 958, it is ruled that the statute does not apply where the "owners of the stocks of a corporation make false or fraudulent representations concerning the assets and financial condition of such corporation in promoting and effecting the sale of such stocks," citing Belcher v. Costello, 122 Mass. 189, 190; Cottrill v. Krum, 100 Mo. 397, 13 S. W. 753, 18 Am. St. Rep. 549; Ruddy v. Gunby (Mo. App.), 180 S. W. 1043; McKee v. Rudd, 222 Mo. 344, 121 S. W. 312, 133 Am. St. Rep. 529; Knight v. Rawlings, 205 Mo. 412, 104 S. W. 38, 13 L. R. A. (N. S.) 212, 12 Ann. Cas. 325; 27 C. J., pp. 172 and 173, secs. 79 and 80. [See, also, Sedgwick v. National Bank, 295 Mo. 230, l. c. 261, 243 S. W. 893; Hess v. Culver, 77 Mich. 598.]

It is true, in the present case, that defendants were not *the owners* of the stock purchased by plaintiff, and were not *parties* to his agreement to purchase. It appears that the stock that plaintiff got was part of the stock held by Speilberg and Venner, and part was treasury stock. The amount from each source does not appear. O'Meara, representing himself and his codefendant, Chevrolet Motor Company, at the conferences resulting in plaintiff purchasing the stock, in justice, should be considered as the agent of Speilberg and the Lindell Chevrolet Company in making this sale. The record shows that O'Meara, prior to plaintiff's coming into the picture, had frequently conferred with Speilberg about finding some one who would put additional money into the Lindell Chevrolet Company. Also, it appears that O'Meara had been active in trying to find some one who would invest in this company. And O'Meara, the record shows, fully appreciated that this company did not have sufficient working capital. The numerous *ours* and *we's* above italicized clearly indicate that O'Meara spoke at the conferences as though he was one of the owners of stock of the Lindell Chevrolet Company, or was authorized

to speak for the owners of such stock and for the company. On the point that there was no evidence tending to show the value of the stock when plaintiff purchased, and therefore no evidence upon which to measure damages, it is sufficient to say that there was substantial evidence that the stock of the Lindell Chevrolet Company, when plaintiff purchased, was worthless. The demurrer to the evidence, we think, was properly overruled.

■ Defendants challenge plaintiff's Instructions 1, 2 and 3. Complaint is made on No. 1, plaintiff's principal instruction, on the grounds (1) that there was no substantial evidence from which the jury could find that the Lindell Chevrolet Company was insolvent at the time plaintiff made his investment; (2) that defendants were not parties "to the contract" (plaintiff's purchase of the stock) and would not be liable, under the Statute of Frauds (Sec. 2970, R. S. 1929) for O'Meara's oral representations as to the solvency of the Lindell Chevrolet Company; (3) that the instruction merely required the finding that the alleged representations "were a material factor in causing plaintiff to make" the investment, when, it is contended, it should have required the finding that the alleged representations were the inducing cause. We disposed of the first and second grounds of attack on Instruction 1 in ruling the demurrer to the evidence. No case is cited by defendants, and we find none, holding that it is *essential* to embody in an instruction in a fraud case, like the one here, such language as defendants contend. We do not think that there was error in giving plaintiff's Instruction No. 1. [Birch Tree State Bank v. Dowler, 167 Mo. App. 373, l. c. 378, 151 S. W. 784.]

■ It is contended that plaintiff's Instruction No. 2 is bad, because it improperly defines (it is claimed) the term "solvent." Instruction No. 2 told the jury that "the word 'solvent' as used in these instructions, means that one is able to pay his debts in the usual and ordinary course of business." It is held in Boone County v. Cantley, 330 Mo. 911, 51 S. W. (2d) 56, l. c. 58, that the term " 'solvent,' as applied to a bank, merchant, or trader, means ability to pay one's debts in the usual and ordinary course of business." We hold that the definition is applicable in the present case.

■ Complaint is made on plaintiff's Instruction No. 3 on the ground that there was no evidence to support punitive damages. Instruction No. 3 told the jury that if they found for the plaintiff, in any amount, and further found that the alleged representations, if made, were made maliciously, "that is, that they were wrongful acts, intentionally done without just cause or excuse," then punitive damages might be awarded. We rule that Instruction No. 3 was proper. [Finke et ux. v. Bayer et al., 331 Mo. 1242, 56 S. W. (2d) 372, l. c. 378, and cases there cited.]

■ Defendants assign error on the refusal of their offered Instructions 2, 5, 6, 9, 12 and 16. Defendants' refused Instruction No. 2 would have told the jury that the burden was upon plaintiff to prove by a preponderance of the evidence that O'Meara and the Lindell Chevrolet Company or its agents "entered into a fraudulent combination to deprive" plaintiff of his investment or some portion thereof, and that unless the jury found that plaintiff had made such proof, then the verdict would be for defendants. Under the pleadings and the evidence, there was no room for defendants' refused Instruction No. 2, and it was properly refused.

Defendants' refused Instruction No. 5 concerned the requirement that plaintiff relied upon the alleged false representations, and that he used reasonable diligence under the circumstances. This instruction was covered by other instructions. Defendants's refused Instruction No. 6, among other things, would have told the jury that plaintiff could not recover, unless it were found that he relied *solely* on the alleged false representations made by O'Meara, and that he could not recover if it were found that he relied "in whole or in part on the recommendations of his counsel." "It has been held repeatedly that it is not necessary to show that false representations complained of were the sole inducing cause, but that it is enough if they were an effective cause along with other considerations; that is, if they excited a material influence on plaintiff's mind, although they constituted only one of several motives which acting together produced the result, it is sufficient." [Weston v. American National Assurance Co. (Mo. App.), 32 S. W. (2d) 789, 1. c. 791-2, and cases there cited.] It was not error to refuse defendant's offered Instruction No. 6.

■ Defendants' refused Instruction No. 9 is abstract in nature, and would have told the jury "that if the means of knowledge are at hand, and equally available to both parties, and the subject matter is open to inspection of both parties alike, and there are no fiduciary relations, and no warranty of the facts, the alleged injured party must show that he has availed himself of the means of information existing at the time of the alleged transaction, before he will be heard to say that he has been deceived by the alleged representations of the other party." In the first place, the general rule is that it is not error to refuse abstract instructions. [Kansas City Suburban Belt Railroad Co. v. K. C., St. L. & C. Railroad Co., 118 Mo. 599, 24 S. W. 478; Dierks & Sons Lbr. Co. v. Runnalls et al. (Mo. App.), 54 S. W. (2d) 447.] And in the second place, if the instruction be considered as concrete, then it was properly refused; because there was no evidence to support all of the propositions it submits.

■ Defendants' refused Instruction No. 12 would have told the jury that the fact that the Lindell Chevrolet Company was adjudi-

cated a bankrupt "some six months after plaintiff purchased stock in said corporation, this would be no evidence of the value of such stock on the date of its purchase." Morrow v. Franklin, 289 Mo. 549, 233 S. W. 224, was an action for fraud and deceit in the sale of corporate stock. The trial court permitted evidence of conditions found "some months after the sale of stock to the plaintiff," and the competency of this evidence was challenged. In ruling the point the court said (233 S. W. l. c. 230) : "The evidence of the happenings from May 28, 1913, the date of plaintiff's purchase, to the final decease of the corporation sheds much light upon the question of the real value of the stock at the date of the purchase." [See, also, Addis v. Swofford (Mo.), 180 S. W. 548.] It was not error to refuse defendants' Instruction No. 12.

Defendants' refused Instruction No. 16 reads: "The court instructs the jury that if you find and believe from the evidence that at the time plaintiff made his investment in the Lindell Chevrolet Company, said concern was doing a profitable business or a business which should have been profitable with ordinary sound, economical and efficient management, then your verdict must be for the defendants." It is said in defendants' brief that refused Instruction No. 16 "presented the converse of the complaint and instructions offered" by plaintiff, and that "under all the authorities" each side is "entitled to have his theory of the case presented to the jury, but able counsel for defendants fail to enlighten us on the proposition that Instruction No. 16 is a converse instruction, and we confess our inability to appreciate the point. The instruction was properly refused.

Defendants contend that Mrs. Lydia B. Jeck, wife of plaintiff, should have been made a party plaintiff. It appears that, at the beginning of the second trial, plaintiff amended his petition by making Mrs. Jack a party plaintiff, and that at the close of plaintiff's case in chief, Mrs. Jeck was dismissed by plaintiff as a party. The contention that Mrs. Jeck should be a party plaintiff is based on the fact that the stock plaintiff purchased was issued to "George L. Jeck or Lydia B. Jeck or the survivor, held by the entirety." To support this assignment defendants cite Peters et al. v. McDonough, 327 Mo. 487, 37 S. W. (2d) 530, and other similar cases. The Peters case holds, as do all cases on the point, that where several parties are jointly interested in the subject matter, "all must be parties in an action to recover thereon." However, as appears here, Mrs. Jeck put no money into the stock, and therefore sustained no loss, and was not a necessary party.

All that defendants say in their brief and written argument on the assignment as to the admission of evidence, is that "the court erred in its rulings on the evidence because the issues should have

been confined to the question of solvency or insolvency of the Lindell Chevrolet Company and to the situation as it existed at the time the investment was made, but it appears from the abstract that about 90 per cent of the testimony had no relevancy to the controversy whatever, but was merely introduced to befog the issues and to lay the ground for an inflammatory argument, and this misconduct of counsel brought about a miscarriage of justice.''

It is not the duty of an appellate court ''to search the record'' for rulings complained of, ''but the duty devolves upon appellants to state in their assignments of error or under their 'points and authorities' the specific matters complained of, and to designate where such rulings can be found in the record.'' [Nevins v. Gilliland et al., 290 Mo. 293, 234 S. W. 818, l. c. 820; Christine v. Luyties, 280 Mo. 416, 217 S. W. 55, l. c. 60; Hunt et al. v. Hunt, 307 Mo. 375, 270 S. W. 365, l. c. 369, and cases there cited.] The evidence in the present record covers 257 pages, and there are numerous objections and exceptions to the admission of evidence. Manifestly, it is not our duty to search this record in order to rule the assignment on the admission of evidence, and we decline to do so.

■ Defendants say there was no evidence to support punitive damages. In order to recover punitive damages ''there must be present in the circumstances, some element of malice, fraud, or gross negligence, otherwise the measure of damages is such an amount as will constitute a just and reasonable compensation for the loss sustained, and nothing more. In other words, the wrongs to which exemplary damages are applicable are those which besides violating a right, and inflicting actual damages, import insult, fraud, or oppression, and are not merely injuries, but injuries inflicted in a spirit of wanton disregard of the rights of others.'' [17 C. J., sec. 271, pp. 974-6.] Under this record, there was ample evidence to support punitive damages.

■ The subject of excessive damages, in defendants' brief, is confined to actual damages. Nothing is said about punitive damages being excessive. Of the assignment that the verdict is excessive defendants say that ''the verdict is grossly excessive and not based on any evidence. No proof was offered relative to the value of the stock at the time of investment.'' This is all that defendants say about excessive damages in their brief or written argument. Plaintiff did not ask an instruction on the measure of damages, but defendant asked and was given an instruction defining the measure of damages as ''the difference between the actual value of the property (stock) at the time purchased and the value or worth it would have been had the representations been true.'' The instruction went on to direct that if the jury was ''unable to find (from the evidence) what this difference might have been,'' then the verdict would be for defend-

ants. The instruction correctly states the rule as to the measure of actual damages. [Morrow v. Franklin, 289 Mo. 549, 233 S. W. 224, l. c. 231-232.] As heretofore pointed out, there was substantial evidence tending to show that at the time plaintiff made the purchase, the stock was worthless. There is no merit to the assignment on an alleged excessive verdict.

It will be observed that plaintiff invested $15,000, but sued for only $14,000 actual damages, and recovered a judgment for actual damages in that sum. The record shows that plaintiff received a $1000 from one Schnure who succeeded the Lindell Chevrolet Company as holder of the Chevrolet franchise at 3949 Lindell Boulevard, and plaintiff credited this $1000 on his claim for damages against defendants.

The judgment should be affirmed, and it is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.