# FRANK L. SEDGWICK v. NATIONAL BANK OF WEBB CITY, Appellant.

### Division Two, August 28, 1922.

1. **DEMURRER: Waiver.** By failure to stand on his demurrer to the evidence offered by plaintiff and by offering evidence to sustain his defenses after said demurrer is overruled, defendant waives his right to have the case determined on the insufficiency of plaintiff's evidence alone.

2. **ACTION: Ex Contractu or Ex Delicto: Sale of Notes.** A petition by which plaintiff sues for the amount of notes sold to him in which he alleges that his damages grew out of defendant's "misrepresentations, concealments and breach of warranty" in connection with the sale, and otherwise sounding in tort, states an action *ex delicto* for fraud and deceit, and not one *ex contractu* for breach of warranty.

3. **FRAUD AND DECEIT: Bank President: Agency: Burden.** In an action for damages against a bank in which plaintiff alleges he was induced by the misrepresentations and concealments of the defendant bank to buy certain negotiable notes sold him by its president, being one for fraud and deceit, the burden is on the plaintiff to show that said president throughout the transaction acted for the bank as its agent, and not in his individual capacity engaged in a personal enterprise. And in this case the evidence shows that the president of defendant bank throughout the transaction was acting in his individual capacity in selling to plaintiff notes made by a cattle dealer in another state, and that plaintiff knew that fact.

   *Held*, by HIGBEE, P. J., concurring, with whom WALKER and BLAIR, JJ., concur, that, in an action for fraud and deceit, there can be no recovery without proof that the representations were false and fraudulent, and in this case there is no proof that the representations made by the president of the bank were not true at the time he sold the notes to plaintiff.

4. ———: ———: ———: **Ratification.** Before a bank can be held in an action for fraud and deceit based upon the misrepresentations of its president in selling to plaintiff notes of a cattle dealer made in another state, it must be made to appear that his representations were made upon authority of the bank, either express or implied, or that they were subsequently ratified by the bank.

Sedgwick v. National Bank.

5. ———: ———: ———: **Authority Must Be in Writing: Fraudulent Representations.** Under the statute (Sec. 2172, R. S. 1919) representations made by the president of a bank that the maker of the notes sold to plaintiff was solvent, in order to be binding upon the bank, must have been made in writing.

*Held*, by HIGBEE, P. J., concurring, with whom WALKER and BLAIR, JJ., concur, that, if the bank through its president sold the notes and the purchaser was induced to buy them by false and fraudulent representations as to the credit and financial standing of their maker, said statute would not apply.

6. ———: ———: **Warranting Solvency.** The duties of the president of a national bank do not warrant representations that the maker of notes about to be sold to a customer is solvent and is the owner of the cattle described in the mortgage securing them, and even if such representations are in writing and are made by the president in his representative capacity they are not binding on the bank in the absence of proper authorization; and particularly is this true if the representations were made in connection with his own personal dealings.

*Held*, by HIGBEE, P. J., concurring, with whom WALKER and BLAIR, JJ., concur, that, under the statute (Sec. 1112, R. S. 1909, as amended by Act of 1915 and now Sec. 11762, R. S. 1919), restricting the power of the president, cashier or other employee of a bank to indorse, pledge or hypothecate any notes received by the corporation "for money loaned until such power and authority shall have been given by the board of directors," the president has no authority, by such representations, to bind the bank to pay any notes he may sell, although they were not originally given for money loaned by the bank, unless he is specifically authorized to do so by its board of directors.

7. ———: **Alternate Pleading: Ex Contractu or Ex Delicto: Representations.** Even if the petition in this cause, alleging a cause of action *ex delicto* for fraud and deceit, were susceptible of a construction that it alleges an action *ex contractu*, the testimony did not develop a cause of action *ex contractu*, but even if it did the question remains whether the evidence shows that the president of the defendant bank, when he sold the notes to plaintiff, was acting in his individual capacity or as agent of the bank and whether the notes sold were owned by the bank; and the evidence clearly establishing that the bank did not own them, and that the president throughout the entire transaction was acting in his individual capacity in carrying forward a private transaction, and

not as agent for the bank, no judgment against the bank could be permitted to stand.

*Held*, by HIGBEE, P. J., concurring, with whom WALKER and BLAIR, JJ., concur, that, although some of the notes made by a cattle dealer in a distant state and sold by defendant's president to him as "gilt edge," were indorsed by the bank and others by its president alone, the plaintiff did not understand that the bank was standing behind the notes or that he was buying them from the bank, else he would have asked for the bank's indorsement, but on the contrary his own evidence shows that they were the president's notes and that he was buying them from him, and such being the established facts there is no basis for a claim against the bank.

Appeal from Jasper Circuit Court.—*Hon. Joseph D. Perkins*, Judge.

REVERSED.

*Frank L. Forlow* and *Howard Gray* for appellant.

(1) The petition is in one count and the nature of the cause of action is to be determined from the facts stated therein. The notes are described, giving their dates and amounts, but the action is founded upon fraud, and therefore this is not a suit or action on the notes or *ex contractu* based on the notes, and although the amount of the notes is stated in the prayer of the petition, this is done merely as the basis of the measure of damages, and the action is in tort. Rawlings v. Bean, 80 Mo. 614. (2) The suit being for fraud and deceit, the question then arises on the liability of the bank for the conduct of its president. Walker, although president of the bank, was from the beginning acting for himself. It is true Walker as president had his offices in the bank and transacted not only the business of the bank, but his individual business, which he had a right to do. Merchants National Bank v. Lovitt, 114 Mo. 519. The doctrine of constructive knowledge is founded solely upon the presumption that the agent will perform his duty,

and communicate his own knowledge to his principal, but where such communication would defeat the agent's own purposes, or disclose his own fraud or misconduct, the presumption does not obtain and the principal is not charged with the knowledge of the agent. Hummell v. Bank, 75 Iowa, 689; Dillaway v. Butler, 135 Mass. 479; Frenkel v. Hudson, 82 Ala. 158. When an officer is individually interested in a note or other matter, his knowledge is not to be imputed to his bank, since his interest is best served by concealing it. 5 Cyc. 461; Hickman v. Green, 123 Mo. 165; Benton v. German Am. Natl. Bank, 122 Mo. 332; Merchants National Bank v. Lovitt, 114 Mo. 519; Johnston v. Shortridge, 93 Mo. 227; Mechanics Bank v. Schamburg, 38 Mo. 228; Manhattan Brass Co. v. Webster Glass Co., 37 Mo. App. 145; State Sav. Assn. v. Nixon Jones Printing Co., 25 Mo. App. 642. Walker and not the bank procured the notes from Williams for sale to plaintiff, and Walker retained all of the commissions paid him by Williams and was an interested party, and his interest was opposed to the bank's interest, and any information Walker had regarding the notes he sold to plaintiff, it was to his interest to keep from the bank, and under such circumstances Walker's information was not the information of the bank. Ruohs v. Chattanooga Bank, 94 Tenn. 57. National banks have no authority to act as a broker in the loaning of money of others; to lend its credit by becoming surety, endorser or guarantor; and it cannot for the accomodation of another endorse his note or guarantee the performance of an obligation. First National Bank v. American National Bank, 173 Mo. 153; Merchants Bank v. Baird, 160 Fed. 642; Grow v. Caskell, 63 Ark. 418; Bank v. Townsend, 139 U. S. 67; Bank v. Kennedy, 167 U. S. 362; McCarney v. Chambers, 48 Ill. 445. The law will not permit an agent's private interest to come between himself and his principal. Its actual presence always disables the agent from binding his principal in the transaction. Claflin v. Farmers & Cit-

izens Bank, 25 N. W. 293; Mercantile Mutual Ins. Co. v. Hope Ins. Co., 8 Mo. App. 408; West St. Louis Savings Bank v. Shawnee Co. Bank, 95 U. S. 557. The theory of the plaintiff by his petition is that the bank owned the notes, sold them to him and received his money for them, all of which is wholly untrue. Before the plaintiff would have any right to claim the bank liable it must show that the bank received the money paid by him to Walker and that the bank had his money, which it of right should return to him. Bank v. Lyons, 220 Mo. 572. If Walker as its president even tried to bind the bank he could not have done so and his conduct would have been *ultra vires*. First National Bank v. Monroe, 69 S. E. (Ga.) 1123; Aldrich v. Chemical National Bank, 176 U. S. 618; Hanover National Bank v. First National Bank, 109 Fed. 421; Western National Bank v. Armstrong, 152 U. S. 346. (3) The burden was on the plaintiff to establish his charge of fraud by clear testimony. Mere suspicion will not answer, nor will fraud be presumed. In determining the question of fraud or fair dealing, the person charged starts with the presumption that he acted in good faith. Zehnder v. Stark, 248 Mo. 50; People's National Bank v. Century Trust Company, 179 Mo. 648; Bank v. Hutton, 224 Mo. 72. The rule is well settled in this State that in order to make out a case of fraud, the plaintiff must prove that the party making the alleged false statements believed, or had good reason to believe, at the time he made them that they were false, or that he assumed or intended to convey the impression that he had actual knowledge of their truth, conscious that he had no such knowledge. Lovelace v. Suter, 93 Mo. App. 429; Dulaney v. Rogers, 64 Mo. 201; Bank v. Hutton, 224 Mo. 70. It is also as well settled that absence of knowledge which renders a representation fraudulent does not cover a case like this one where the party making the representation has such information as comes from a fair investigation and the exercise of his own faculties by one having a fair knowledge of the subject. Bank of

Polk v. Wood, 189 Mo. App. 71; Peters v. Lohman, 171 Mo. App. 465; Bank v. Hutton, 224 Mo. 42, 123 S. W. 47; Miller v. Rankin, 136 Mo. App. 426; Atchison v. Byers, 139 Mo. 627; Snyder v. Stemmons, 151 Mo. App. 156; 20 Cyc. 24-27. The fact that Walker said that the loan was gilt edge did not make him guilty of fraud. It has often been held that a statement that a bond was "good," or "good as gold" or "A 1," or "good as old wheat in the mill," made by the vendor as to the value of the property cannot be made a basis of an action for fraud and deceit. Gordon v. Parmalee, 2 Allen (Mass.) 212; Van Epps v. Harrison, 5 Hill. 63; 40 Am. Dec. 314. (4) It was error to give plaintiff's instruction numbered 4. It authorized a recovery on a cause of action not alleged in the petition. By this instruction the jury were told that, even though the original transaction was in good faith, and even though Walker was deceived as to the number of cattle Williams had, yet if subsequently the stock owned by Williams, which was described in the mortgage, was sold by and with the consent of Walker, then the plaintiff was entitled to recover the full amount of his notes and interest at ten per cent attorneys' fees. Under this instruction all the allegations of fraud are eliminated and become wholly immaterial. The plaintiff's measure of damages under the law relative to the facts was not the amount of his notes, interest and attorneys' fees, and the bank could not have been held liable. (5) Plaintiff's instruction 14 is clearly erroneous because it told the jury if they found for the plaintiff to assess his damages for the full face of the notes, together with ten per cent interest from maturity and to that add an attorneys' fee of ten per cent. Bank v. Lyons, 220 Mo. 538; Bank v. Bank, 244 Mo. 554; Lack v. Brecht, 166 Mo. 242; Corder v. O'Neill, 176 Mo. 401; Whistler v. Bragg, 31 Mo. 124; Snead v. Hughes, 14 Ga. 542; Boston National Bank v. Armour, 6 N. Y. Supp. 714; Roley v. Walker, 161 Ill. App. 646; S. Covington & R. R. Co. v. Jess, 34 Fed. 628. It seems plain that the plain-

tiff, suing on the theory that the contract was induced by fraud and alleging that he tendered back what he received and ended the contract, cannot at the same time recover a judgment under the contract as though the contract were yet in full force. This being a suit, not on the notes, but for fraud and deceit in the sale of the notes, the plaintiff does not recover on the notes and therefore is not entitled to attorneys' fees. The contract for the sale of the notes in question was made in this State and therefore governed by the laws of this State and not by the laws of Oklahoma. Walling v. Cushman, 130 N. E. 175; Heidelburger v. Heidelburger, 155 N. Y. Supp. 993; Spies v. National City Bank, 174 N. Y. 222; National Bank v. Kellogg, 183 N. Y. 91.

*S. W. Bates* and *W. R. Robertson* for respondent.

(1) The defendant having answered in this case, all such objections as that there is joined in the petition causes of action that should not be united, and that causes are commingled, are waived. Dorrance v. Dorrance, 257 Mo. 317, 325; Mulholland v. Rapp, 50 Mo. 42; Stone v. Perkins, 217 Mo. 586, 604; Gardner v. Robertson, 208 Mo. 605; Jordan v. Transit Co., 202 Mo. 418; McQuade v. Suburban Ry. Co., 200 Mo. 150, 155. (2) This case having reached this court without any objection to the petition, or to the introduction of testimony, we are relieved of any needed discussion of intricacies in pleading, which serve more as pitfalls than as aids to a just administration of the law. It is enough, under our system, that such facts appear as justify a judgment the one way or the other. Ackerman v. Greene, 195 Mo. 124, 143. (3) In the consideration of plaintiff's petition, after it has reached this stage, if, by a most liberal construction, its essential allegations may be got at by inference, it must be upheld. East St. Louis Ice & Cold Storage Co. v. Kuhlmann, 238 Mo. 685, 702. (4) Where the petition occupies an indeterminate middle ground,

so as to enable the plaintiff to go to the jury on either one of two theories, it is the duty of the court to construe it according to either theory developed by the testimony. Henry Gaus & Son Mfg. Co. v. Magee, 42 Mo. App. 307, 314. (5) "A failure of proof within the meaning of our decisions occurs when the petition or answer is unproven in their entire scope or meaning." Smith v. Fordyce, 190 Mo. 1, 19. (6) "No variance between the allegations of the pleadings and the proof is material, unless the adverse party has been actually misled thereby, to his prejudice, and that a variance can only be taken advantage of by affidavit, setting forth in what respects the complaining party has been misled; and the statute has provided that this is the only test of the materiality of the variance." Bingham v. Tinsley, 149 Mo. App. 467, 481; Van Walte v. Epstein, 202 Mo. 173, 193; Mekos v. Fricke, 159 Mo. App. 636, 637. (7) Among the enumerated powers of national banks (R. S. U. S. 5136, 5 Fed. St. Ann. 82, 1st Ed.) are "to exercise by its board of directors, the duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidence of debt." It is within the scope of the implied powers of the president of a national bank to endorse negotiable paper in the ordinary transaction of the bank's business, and special authority to that end need not be conferred by the board of directors. U. S. National Bank v. 1st National Bank, 79 Fed. 296; Lipscomb v. Talbott, 243 Mo. 1. And this statute is sufficiently comprehensive to include the purchase of notes at less than their face value. Morris v. National Bank of Springfield, 142 Fed. 25. It also includes the power to purchase negotiable paper without endorsement. Danforth v. National State Bank, 48 Fed. 271. The vice-president of a national bank is presumed to have power, on transferring a promissory note, to make a guaranty thereof, as that is less onerous and

stringent than the obligation created by an endorsement. People's Bank v. Manufacturers' National Bank, 101 U. S. 181. A national bank may be charged with having discounted paper through its president, though it does not endorse it. Hanover National Bank v. National Bank of Burlingame, 109 Fed. 421. National banks are not relieved of liability because of the fact that involved in their transactions are obligations in excess of the amount they are allowed to deal in by acts of Congress. Weber v. Spokane National Bank, 64 Fed. 208; Cherry v. City National Bank, 144 Fed. 587. (8) The Federal statute cited above, and the decisions of the Federal courts thereon, give the active managing officials of national banks comprehensive authority, but even that broad authority may be further enlarged by the facts and circumstances developed in any given case, and in the consideration of this question it is proper to keep in mind that in this case the defendant prior to the transactions involved and during the time thereof, had extensive dealings with Williams, handling first and last, besides the notes involved in this case, over $25,000 his paper, and at the very time when plaintiff discussed with Walker the question of purchasing first class paper from his bank the bank held unsecured notes of Williams; that all this business was transacted through Walker, who, it now appears, when he purchased the control in the bank he obtained the exclusive management thereof; and that after the bank had learned the manner in which he, as its president, had dealt with one of its oldest customers, he was again, shortly before the trial, re-elected to this position which he had so arbitrarily filled. When the parties engaged in the transaction are agents of the bank, if there is any defect of authority on their part, "the retention and enjoyment of the proceeds of the transaction by their principal constituted an acquiescence as effectual as would have been the most formal authorization in advance, or the most formal ratification afterwards." People's Bank v. Manufacturers' National

Bank, 101 U. S. 181; Union National Bank v. Lyons, 220 Mo. 538, 555. The bank, having accepted a portion of the proceeds of a transaction had with its cashier, cannot escape liability, although, strictly speaking, he may not have had the authority to represent the bank in such transaction. No action of the board of directors is necessary, because "that which they ought, by proper diligence to have known as to the general course of business in the bank, they may be presumed to have known in any test between the corporation and those who are justified by the circumstance in dealing with its officers upon the basis of that course of business." Martin v. Webb, 110 U. S. 7. Where an officer of a national bank borrowed and embezzled $300,000, his bank was held liable, and it was also held that the bank, having received the money through its officers, could not successfully defend on the theory of *ultra vires*. Aldrich v. Chemical National Bank, 176 U. S. 618; Musgrove v. Macon County Bank, 187 Mo. App. 483. Where a president of a bank represents both parties to a transaction, a part of which involves the bank and him personally, and he is the sole representative of the bank in the transactions with himself, there is no one from whom he could conceal his personal interest, or to whom it could be communicated. "As the representative of the bank, his knowledge was not affected by his interests, however much his conduct may have been. He necessarily knew as much in one capacity as he did in the other." First National Bank v. Blake, 60 Fed. 78; First National Bank v. Burns, 49 L. R. A. (N. S.) 764; Holden v. New York Erie Bank, 72 N. Y. 286; Leonard v. Latimer, 67 Mo. App. 138, 146; Lilly v. Hamilton Bank, 29 L. R. A. (N. S.) 558. (9) It may properly be concluded, from the facts and circumstances disclosed in this case, that Walker had the sole and exclusive management and control of the defendant bank, and was, in fact, the bank. Martin v. Webb, 110 U. S. 7. (10) "Every person negotiating an instrument by a delivery, or by qualified endorse-

ments, warrants: That he has no knowledge of any fact which would impair the validity of the instrument or render it valueless." R. S. 1919, sec. 851. Such was the law in this State, and in many other states, if not in all of them, prior to the enactment of this section of the Negotiable Instrument Law. Jamison v. Copher, 35 Mo. 483, 486; Conover v. Berdine, 69 Mo. 125; Brown v. Montgomery, 20 N. Y. 287. One who thus transfers negotiable paper incurs a liability of a vendor of personal property. Smith v. Corege, 53 Ark. 295, 14 S. W. 93; Hawkins v. Shields, 100 Miss. 739; McAdams v. Grand Forks Merc. Co., 24 N. D. 645, 140 N. W. 725. (11) The Laws of Oklahoma, except as herein otherwise shown or admitted, as is done regarding the rate of interest are presumed to be the same as our laws. Lillard v. Lierley, 202 S. W. 1057. (12) The mortgage in this case becomes an incident to the debt and follows it like a shadow They are inseparable. Lipscomb v. Talbott, 243 Mo. 1, 31. (13) The evidence tended strongly to prove, if it did not conclusively prove, that at and long prior to the time when plaintiff acquired the notes involved in this case, Walker had notice of the insolvency of Williams. Brown v. Montgomery, 20 N. Y. 287. It is also proper to consider that Williams was reputed in Pauls Valley at this time to be insolvent, and involved in a great deal of litigation. Conover v. Berdine, 69 Mo. 125, 126; Gordon v. Ritenour, 87 Mo. 54, 58. (14) It is evident that Williams was, as a matter of fact, insolvent at the time the mortgage and notes involved in this litigation were given. Subsequent developments disclosed that he was not able to pay the claims which were then against him and his property upon which suits were then instituted, and that executions were thereafter issued and returned unsatisfied. Eddy v. Baldwin, 32 Mo. 369, 374; Mitchell v. Bradstreet, 116 Mo. 226, 240; Schwabacher v. Kane, 13 Mo. App. 126. (15) In the absence of evidence that the attorney's fees provided for in the negotiable instrument are unreasonable, it is proper to instruct for

this additional sum.  North Atchison Bank v. Gay, 114 Mo. 210; German-American Bank v. Martin, 129 Mo. App. 488.  (16). Evidence that a mortgagor had deposited the proceeds of the property covered by the mortgage in a bank to his own credit is evidence of conversion.  Embree v. Roney, 152 Mo. App. 260.  (17) Where the facts are disclosed, as in this case, that no sooner had the paper in controversy here been purchased by the plaintiff than Walker and Williams immediately commenced discussing and negotiating sales of the cattle, and that out of the first proceeds thereof the bank obtained money which it applied upon the obligations of Williams to it, and failed to disclose to the plaintiff anything about these sales and application of proceeds, that the burden was then cast upon the defendant to fully explain and show to be fair its connection with such sales, because under these facts the presumption could not be indulged in its behalf, in the absence of any showing to the contrary, that it did not know of the disposition of all of the cattle owned by Williams and covered by the mortgage, if what plaintiff shows was sold were not all of such stock.  National Bank v. McCrory, 191 Mo. App. 295; Cudahy Packing Co. v. Ry. Co., 196 Mo. App. 528.

REEVES, C.—This is an action for damages.  On March 18, 1920, plaintiff (respondent) filed his petition against defendant (appellant) for damages growing out of "misrepresentations, concealments and breach of warranty as herein alleged."  Upon a trial of the issues joined he was awarded a verdict for $35,831.12, and after an unsuccessful motion for a new trial defendant has prosecuted its appeal to this court.

The petition alleges that defendant was a national banking corporation and engaged in its appropriate business at Webb City; that on the 7th day of February, 1919, respondent was a depositor in said bank; that one R. L. Walker on said date, and for a long time prior

295 Mo.—16

and subsequent thereto, was president and had the management and control of its business, "made loans and discounted paper for it, and was, during all of said time, held out by said 'defendant as having full authority therefor, and all of his acts in that behalf as herein set out or referred to were fully authorized, acquiesced in and ratified by defendant; that defendant held and had re-discounted the notes of one B. H. Williams of Garvin County, Oklahoma, for large sums of money, which it was desirous of protecting itself upon and profiting as herein shown."

It was further alleged that the defendant held seven promissory notes of the said B. H. Williams, payable to one O. B. Avent, "three for the principal sum of $2575 each, three for $10,300 each and one for $5150," which notes were dated January 23, 1919, and payable six months after date, with interest from maturity at the rate of ten per cent per annum, with ten per cent penalty, if placed in the hands of an attorney for collection, after maturity; "that all of said notes were endorsed by said Avent; without recourse; that the three $2575 notes were also endorsed by defendant without qualification, condition or restriction; that the three $10,300 notes were endorsed by the said Walker without qualification, condition or restriction, and that defendant was the owner of all of said notes and was desirous of disposing of the same to this plaintiff for the purposes herein alleged."

Respondent further alleged in his petition that on account of his business relations with appellant it "had gained his confidence and he relied on its recommendations as to securities, which defendant well knew; that the defendant knowing of plaintiff's said confidence in it and that he had in its bank large deposits, and knowing that he would loan the same on what defendant recommended as safe securities, or would purchase the same, and at a low rate of interest, and knowing that by reason of plaintiff's long experience with it as a banking institution he had as aforesaid implicit confi-

dence in it and relied solely upon its recommendations and representations, *defendant represented to plaintiff that said Williams and his wife were solvent; that said notes were secured by chattel mortgage on eighteen hundred head of cattle and fifty-five head of horses and mules then belonging to said Williams on his farm where he lived;* . . . that said mortgage was a first lien of record on said property worth many thousand dollars more than the amount of said notes, and that the said Walker was solvent.''

Respondent then alleged that on or about February 7th and April 23, 1919, relying upon the ''recommendations, representations and statements of defendant'' he purchased all of said notes except one for $5150 and one of the $10,300, and paid therefor the sum of $27,593.-75, and thereupon appellant delivered said notes to him.

Respondent then alleged that Williams, the maker, and Walker, the endorser, were insolvent; that the security was not as represented; that the defendant had the exclusive management and control of the mortgaged property; that Williams had sold a portion of said property without his knowledge and consent and had applied the proceeds to the payment of the notes held by appellant, and that appellant concealed all knowledge thereof from respondent.

Respondent further alleged that the Negotiable Instrument Law of Oklahoma, where said notes were executed, was the same as the Negotiable Instrument Law of Missouri; that upon discovery of the ''misrepresentations, concealments and breach of warranty as herein alleged, he offered to surrender said notes to the defendant upon its payment to him of the amount due him thereon, as herein alleged, and now brings said notes into court and renews said tender.''

He claimed that he had been damaged in the sum of $500 for expenses incurred in personal investigation of said mortgaged property and the further sum of $28,325, ''together with an amount equal to the interest thereon at the rate of ten per cent per annum from

July 23, 1919, and ten per cent of said total of principal and interest.'' He prayed judgment accordingly.

The answer was a general denial.

The evidence on the part of the respondent tended to show that he was engaged in the furniture and undertaking business at Webb City and about December 1, 1918, ''commenced closing out'' his business, whereupon he noted that he was ''accumulating a balance in the bank'' and called on Walker, the president, with respect to the purchase of securities as an investment, at which time he said to Walker: ''I will expect you people to furnish me paper out of your files if it is good and all right. Something you folks can stand back of and gilt edge. He said they thought they could take care of me.''

That about two weeks thereafter while at the bank Walker ''told me they had been handling some paper for a ranchman in southern Oklahoma, and he might be in a position that they could turn me some of that before long. About the 5th of February, 1919, following, I was there and he said he had some of the notes that they had gotten from the ranchman that he had mentioned before, and he showed me several notes and a mortgage and offered to sell me some of them. He said they had done business for this party for years, and handled his notes, and that he had gone down there personally and he had seen the cattle described in the mortgage. . . . He said: 'We will sell you some of these notes.' *He also said there was a profit in it, but he did not get it personally; that he was not the kind of a man to take any commission for himself in a deal of that sort, but that the profits would accrue to the bank.* I looked these notes over and noticed there were two $10,300 notes. . . . I believe it was the 14th of February I took the two $10,300 notes and mortgage to cover.''

It further appeared that about the middle of April respondent had accumulated the further sum of about $8,000, and again went to the bank and asked for ad-

ditional securities for investment from Walker, and obtained the three notes for $2575 each. · These notes were all dated January 23, 1919, and matured for payment July 23, 1919. In like manner he subsequently obtained two $1500 notes executed by the same maker and secured by the same property, both of which were paid by Walker. The latter notes, however, were not specifically described in the mortgage, but were included in the language, ''And all other indebtedness, owing by party of the first part to the party of the second part before or after maturity of said notes.'' The two $10,300 notes were endorsed, ''Without recourse on me'' over the signature of O. B. Avent, the payee, and R. L. Walker, and the three $2575 notes were, in like manner payable to O. B. Avent, endorsed by him, ''Without recourse on me,'' and then on the back thereof appeared the following: ''The Natl. Bank of Webb City, Mo. By R. L. Walker, Pt.''

About July 1st respondent was in appellant bank and again talked with Walker, who asked him if he would need the money on the notes falling due July 23rd. ''I told him I was not in any business yet and did not figure on being for some time, but for him to ascertain whether they would be good after they were due, to run on overdue paper; to see Mr. Forlow and investigate them and see whether it was all right. In about two weeks he spoke to me again and said he had attended to it and that everything was all right.''

In January, 1920, Walker told respondent that he was afraid the mortgagor had sold some of the cattle. Respondent then consulted his attorney and about three o'clock of the same day went to ''the bank and asked Mr. Walker to put a protest waiver on the back. Mr. Walker said it was not necessary. I demanded it, and he went back to his desk and looked over two or three papers and came back and said he could not find it.'' Later respondent put the notes in the hands of his attorney for collection, and on the day he did so talked

with Mr. Walker, who told him to bring in the three notes that had the bank's endorsement and get his money on them. At that time Walker told respondent "that the two notes that had his endorsement on the back he could not pay, because he did not have it." Thereafter respondent had an interview with the maker of the notes, and made an inspection trip to Oklahoma regarding the property mortgaged.

Appellant bank acquired the note for $5150, and respondent's sister acquired the other $10,300 note. In payment for these securities respondent drew checks payable to the order of R. L. Walker, and such checks bore the endorsement of R. L. Walker. On February 7, 1919, respondent gave one check for $5900 payable to the order of R. L. Walker on which there appeared the notation, "Money loaned." This check bore the endorsement of R. L. Walker. On the same day check No. 66 for $2300 was made payable to the order of R. L. Walker and contained the notation, "Money loaned." This check bore the endorsement of R. L. Walker, and on said February 7th he gave another check for $8,600 payable to Walker's order and containing the notation, "Money loaned," which check contained the personal endorsement of R. L. Walker. On April 23rd he gave other checks payable to Walker's order and endorsed in the same way.

Much documentary and oral proof was offered by respondent with respect to the financial condition and responsibility of the maker of said notes and the nature and character of the property given as security, all tending to minimize the quantity and value thereof and to discredit the business methods of the maker.

It was shown that the aggregate of notes secured by said mortgage was $43,775; that Walker had arranged for said loan, and that various indebtedness of the maker was taken up and paid upon the consummation thereof. All of this appeared on financial statements prepared on the letter heads of appellant bank.

As against said loan there was charged a discount at six per cent for six months in the sum of $1275 and a charge, "Cost Floating Loan $2500." The other items charged against the amount of the loan were for the most part for prior indebtedness of the maker to be liquidated from the new loan.

The documentary evidence offered by respondent showed correspondence between Walker and various creditors and interested parties, and clearly set out Walker's interest and part in the matter. For instance, on January 29, 1919, he wrote to the payee of said notes wherein he said, "Will want a mortgage for each note, as the notes will, perhaps, be used in different places, and some may have to be re-discounted at the Federal Reserve Bank."

On the same day he wrote the maker wherein he said: "I have just written to Mr. Whatley with reference to the five hundred steers in Mrs. Bierce's mortgage, and from which the National Bank has only a second mortgage. *I have stated to him that if they can arrange* with Mrs. Bierce to release the mortgage on the five hundred steers, so that mine will be first, that I will make the loan."

On November 14, 1919, Walker wrote the maker acknowledging receipt of check for $1710 and reported its expenditure as follows:

Paid principal note $1500, interest ........ $43.75
Paid interest on one note, held by the
    Bank in Carterville ................. $44.46

"This made a total due me of $1588.21, leaving a balance of $121.79 which was applied to interest on note for $5150 held by this bank and past due since July 23rd."

On November 28th he again wrote Williams, the maker, wherein he said: "I am enclosing note for $2500 that has been held by the Miners Bank of Carterville which I have paid. I haven't got to see Mr. Sedgwick yet as he has been out of town, will perhaps see him

tomorrow. *I will take up two small notes that he has, $1500 each.*"

On the same day he wrote Williams as follows:

"Mr. Sedgwick just came in and brought the two enclosed notes for which I gave him check for $3130.91 to cover note and interest. This left a balance in my hands of $4365.21. The bank here holds note for $5150, the interest on this note to date is $60.33, making total of $5210.33. I have credited the note with $4304.88 and $60.33 interest, leaving a total due us on this note of $845.12."

On December 8th Walker again wrote Williams:

"Mr. Sedgwick was in today and said if you would [pay] him three small notes of $2500 each or $7500 with int. from July 26th @ 10% he would carry balance until April."

Among the other items of indebtedness taken up at the consummation of the loan on January 23rd was one of $26,180.21 to the American National Bank, Oklahoma City, and on January 23, 1919, the vice-president of that bank wrote Walker as follows:

"Mr. R. L. Walker,
    "c/o Webb City National Bank,
        "Webb City, Mo.
"Dear Mr. Walker:
    "We are sending through our collection department a draft on you for $26,180.21, to which is attached all of the B. H. Williams papers together with copies of mortgages securing same and releases of mortgages, all to be delivered to you upon the payment of our draft.
    "You will understand that this does not include the $25,000 note which is held by Mrs. Bierce, which is secured by real estate and a mortgage on some cattle, in which I understand you are not interested.
    "We are also enclosing herewith for your information a take-off from the records of Garvin County, showing the chattel mortgages of record, executed by Mr. Williams.
    "If, for any reason, this draft is not taken up, kindly have

your bank return all the papers attached, including this take-off of the records, to us by registered mail.

"Yours respectfully,

"J. P. WHATLEY,

"JPW/FN                                    Vice-President."

On the same day the Oklahoma City Bank wrote appellant bank, as follows:

"Webb City National Bank,
    "Webb City, Mo.
"Gentlemen:

"Enclosed herewith you will find a draft drawn on R. L. Walker payable February 1st, for $26,180.21, to which is attached four notes executed by B. H. Williams, together with certified copies of mortgages securing these loans and releases of mortgages.

| Payee | Amount of Note | Amount of Int. | Total |
|---|---|---|---|
| American National Bank   Bal. | $9305.99 | $337.37 | |
| American National Bank | 8700.00 | 297.24 | |
| R. A. Vose | 3996.54 | 355.56 | |
| First National Bank, Luther | 2869.65 | 267.86 | |
| | | | $26180.21 |

"Please deliver all of the attached papers to Mr. Walker on the payment of $26,180.21, net, which you will remit to us in New York, Kansas City or St. Louis exchange.

"Trusting that you will fully understand this letter and that you will return the draft with all the papers attached by registered mail, in case the same is not paid on or before February 1st, I am,

"Respectfully yours,

"J. P. WHATLEY,

"JPW/FN                                   "Vice-President."

On January 24th the Oklahoma City Bank wrote Walker as follows:

"Mr. R. L. Walker, Pres.,
    "The National Bank of Webb City,
        "Webb City, Mo.
"Dear Mr. Walker:

"Replying to your letter of the 23rd inst. beg to advise that you are right about the amount of paper which you were to take up for Mr. Williams, except in the amount of the note held by us, and the amount held by Mr. Vose, both secured by a mortgage

for $18,700, as our note was $10,000 and the other note $8,700. In addition to this, Mr. Williams owed us some smaller notes furnished him for harvesting his broom-corn crop. which were taken up out of the cashiers' checks and full rebate for the interest on account of these cashier's checks was allowed in computing the interest due us from Mr. Williams. '

"We sent all of this paper to your bank attached to our draft payable February 1st, in yesterday's mail, and presume that it will have reached there before this letter will reach you. We also wrote you fully concerning this matter.

"Trusting that you will fully understand the same, and assuring you that we will be glad to co-operate with you in any way at any time, and that personally, I will be glad to hear from you further regarding the Mr. Wasson who you told me was an experienced mining man, I am,

"Yours respectfully,

"J. P. WHATLEY,

Vice-President."

"JPW/FN.

On January 25, 1919, Walker wrote Williams as follows:

"B. H. Williams,
    "Elmore, Oklahoma.
"Dear Sir:
    "I am just in receipt of a draft on me by the American National Bank of Oklahoma City, to take up your notes due them as follows:
    "1 note for $9305.99.  Interest due $337.37.
    "The above was formerly $10,000 but has two credits of $506.90 and $108.11 respectively.
    "1 note for $8700, interest due $297.24.
    "R. A. Vose, $3996.54, interest due $355.56.
    "This note bears interest at rate of 10 per cent from date.
    "1st Nat. Bank, Luther $2869.65, interest due $267.86.
    "Total $26,180.21.
    "In the copies of these mortgages there is a second mortgage on 601 head of cattle; first mortgage being held by Mrs. Bierce to cover her loan of $25,000.  I also find a copy of the records show that D. R. Kendall and Joe Wilmouth have a mortgage on 700 head of cattle for $12,485.50.  This mortgage is dated April 16th, and filed for record May 22nd, 1918, No. 30259.  According to the records you have mortgaged 2272 cattle.  I believe you claim to have 1750 or 1800 head, this would make a second mortgage on 405 head.

"Now when I was there I rather advised you not to get a land loan at this time, however, if you could get this loan now, you could pay off Mrs. Bierce, thereby releasing the cattle upon which she holds first mortgage and upon which I would hold second mortgage on at least a part of them. The way the mortgages are mixed up it makes me a little undecided until I hear definitely from Pauls Valley.

"I do not think you ever mentioned the 700 cattle mortgage to Kendall and Wilmouth for the $12,485.50 which was due Oct. 13th, 1918. This may be a mortgage on the Texas cattle, however, you gave that as $6400; I cannot understand the difference.

"Please let me hear from you at once, as I only have until Feb. 1st, 1919, to make returns to the American National Bank of Oklahoma City.

"I suppose the $26,801.21 takes up everything at the American National Bank, especially as they say nothing about anything of the credits for the cashiers' checks and I notice in figuring the interest they have given no rebate on the interest for this amount being held up by them. It may be, however, they have some small notes yet, I do not know, they only sent those in connection with the mortgage.

"I hope we can get this matter straightened out so that I can make you the loan. I feel you can get out if you have any kind of a crop and if not, if you can get the cattle through to grass they will pay off the cattle debts anyway.

"In my letter to Mr. Avent I mentioned I would take a mortgage on horses, mules and cows, but did not mention the crops. It might be well for you to include the crops in your mortgage to me, also the implements.

"Hoping to hear from you soon, I am,

"Yours very truly,

"RLW/JC.                       ———————— President."

On January 27, 1919, Walker wrote the American National Bank as follows:

"Mr. J. P. Whatley,
    "Vice President American Nat'l. Bank,
        "Oklahoma City, Okla.
"Dear Mr. Whatley:

"I have yours of the 23rd inst., with reference to the amount due you from Mr. Williams, being $26,180.21. Will also state that the bank has received the notes and copies of mortgages for collections covering this amount, which we are to hold until February

Sedgwick v. National Bank.

1st, in case we cannot get matters straightened up before that time.

"With reference to this matter I beg to state that I am trying to get a real line on what Mr. Williams actually owes on the cattle, and the actual number of cattle he really owns. I have a report to the effect that your collector, when he went down to see the cattle and count them, that he thot Mr. Williams tried to show him the same cattle twice, and also some cattle belonging to other parties, in order to make up the required number he claimed to own. I saw three bunches of cattle I am quite sure were not the same cattle at all. I counted about 1350 head. I did not take particular notice that they all bore the 'W' or 'WW' brand, but Mr. Williams claimed to own the cattle.

"If Mr. Williams has the cattle to secure the loan, I can make him a loan of from thirty-five to forty thousand dollars, or even more; but, if there is anything wrong with Mr. Williams that you know of, or is likely to be anything misrepresented in this deal by Mr. Williams, I do not want to have anything to do with it. I am satisfied from what I have seen of the records that your mortgages are good, and I have one for about $4,000, covering 103 head of cattle. If I find that I cannot make this loan for Mr. Williams I will let you know at once, and will join with you in any foreclosure proceedings for our mutual protection.

"The mortgage to D. R. Kendall and Joe Wilmeth for $12,480.50 must be the one that he mentioned to me as the Chicago Cattle Loan Association for $6400, in which case a part of the note must be paid. I have written Mr. Williams asking for explanation to this matter. If I find we cannot make the loan will return your papers to you at once.

"The Mr. W. W. Wampler that I mentioned to you as a party who might take an interest in your mining proposition is out of town at present and I have been unable to see him or his son. I understand he will be at home in a few days, at which time I will take the matter up with him. I have been unable to find anyone else who would be interested, and that would be a suitable party for you.

"Assuring you of my willingness to assist you in any way that I can in this matter, I am,"

Again on February 1, 1919, Walker wrote the American National Bank, as follows:

"Mr. J. P. Whatley,
    "Vice President American National Bank,
        "Oklahoma City, Okla.
"Dear Mr. Whatley:
    "I was just returning your draft, together with the notes and

record of Mr. Williams's mortgage in Garvin County; also report of your examiner Mr. King.

"I received Mr. Vose's letter stating that he would have the mortgage on the cattle held by Mrs. Bierce, released, in order that I might get first mortgage on 1350 head, as had been agreed to by Mr. Williams.

"I have taken some time to try and get this matter straightened out; in fact, I could not see where Mr. Williams had ever purchased the amount of cattle it would require to cover the mortgage he was giving me, and mortgages held by other people, but have at last I believe, got it down to where I can secure a mortgage on from thirteen to fifteen hundred cattle. When I receive those papers properly executed, I will take up your draft.

"However, if it is not satisfactory for the bank to hold this matter until the latter part of next week, please wire me at my expense, and the bank will return those papers at once. I trust the fact that we are not returning them will cause no inconvenience, and I thot perhaps my plan would meet with your approval.

"With reference to Mr. Wampler, will say he has not yet returned from Kentucky but is expected any time. When he returns, I shall present your matter to him, and I will write you in regard to it.

"With kindest regards, I am,

"Yours truly,

"_____

"RLW/RV                              President."

On February 3, 1919, Walker received the following reply:

"American National Bank,
"Oklahoma City, Okla.,
"2-3-19.

"Mr. R. L. Walker, President,
    "The National Bank,
        "Webb City, Mo.
"Dear Mr. Walker:

"Replying to your favor of the 1st inst. beg to advise that it will be perfectly satisfactory with us for you to hold the Williams paper for the rest of this week until you get your loans in shape to pay out on them.

"You will understand of course, that we will be entitled to 10% interest on the amount of same from February 1st up to the time your remittance reaches us.

"Referring to the Wampler matter, beg to say that I believe that I will be in a position to make him an attractive offer, and I-would appreciate it if you will have him write·me immediately upon his return from Kentucky.

"Assuring you that we will be glad to co-operate with you in any way possible in the Williams matter, I am, .

"Yours respectfully,

"J. P. WHATLEY,

Vice-President."

"JPW/ML

On February 8, 1919, appellant bank wrote the American National Bank, as follows:

"J. P. Whatley, V. P.,

"American National Bank,

"Oklahoma City, Okla.

"Dear Sir:—

·"We are enclosing herewith our draft on Kansas City for $26,238.37, to cover your draft on R. L. Walker for $26,180.21, with 10% interest added for eight days.

"This will take up notes of the American National Bank, R. A. Vose and First National Bank of Luther, Okla.

"Trusting this will be, satisfactory, we are,

"Yours very truly,

"RLW/JC                    ——————, President."

On the same day, February 8th, Walker wrote the mortgagor as follows:

"B. H. Williams,

"Pauls Valley, Okla.

"Dear Mr. Williams:

"I sent draft payable to yourself and Mr. Avent yesterday for $1000. I am sorry the bank would not pay on my message, but I did not know of feed' restrictions.

"I received a message from Mr. Vose yesterday stating he was forwarding release of the Bierce mortgage on the cattle. I am also sending to the American National Bank of Oklahoma City, today, draft for $26,238.37, which is to pay them in full to date. Their draft on me was for $26,180.21, but I had to pay eight days interest which makes the difference.

"I have not been able to place but $30,000 of the paper, aside from what we have in our bank. We have taken up our notes as follows:

Sedgwick v. National Bank.

```
"One note ..................................$ 597.24
  ,,    ,,   .................................. 3000.00
  ,,    ,,   .................................. 100.00
Interest .....................................  234.00
Total ......................................$3931.24
```

"Also draft to yourself and Avent for $1000; $8.76 revenue stamps; $10 recording fees; $50 for my expenses of two trips to Oklahoma, making total of $5,000 which takes care of the $5,000 note.

'In regard to the Chicago Cattle Loan Association, I will take that up with Mr. Wilmouth at once and will try and take care of the matter soon, however, I may have to wait until I can dispose of more of the paper, as I stated before I was only able to place $30,000 and I still have $7,000 of the paper on hand. As soon as I have the matter wound up I will send you complete statement.

"Wishing you much success this summer, I am,

"Yours very truly,

"RLW/JC                              ————————, President."

Other documentary proof tended to confirm the foregoing and was of a kindred nature. For instance, on November 24, 1919, Williams, the maker of said notes, procured a draft from the Pauls Valley National Bank for $10,000 payable to the order of R. L. Walker and forwarded same to him, the amount thereof being applied in accordance with correspondence hereinbefore set out.

On the part of the appellant, R. L. Walker testified that he sold respondent the notes in question; that the three $2575 notes, at the instance of respondent, he arranged to carry until respondent had money to take same up and that he placed said notes in appellant bank and then sent them to the Federal Reserve Bank at Kansas City. "In a short time Mr. Sedgwick came in and said he was ready to take up these three notes and I sent for them at the Federal Reserve Bank and got them for him."

Witness Walker identified a paid check dated February 8, 1919, for $26,238.37 as the check given by him

personally to take up the draft of the Oklahoma City Bank heretofore mentioned.

Witness Walker testified that he had personally made other loans for respondent and had sold him other securities in the year, 1919, in which appellant bank was not interested. Other testimony on the part of the appellant tended to show financial responsibility of B. H. Williams, the maker of said notes, and the sufficiency of the security given therefor.

At the conclusion of the evidence adduced by respondent appellant demurred, and being overruled offered its testimony, and at the conclusion of all of the evidence requested the court to direct a verdict in its favor, but was again overruled. The case was submitted to the jury on sundry instructions resulting in a verdict as above stated.

I. Appellant complains of the action of the trial court in overruling its demurrer to the evidence adduced by respondent. We cannot consider this assignment of error for it is well settled law that if appellant intended to rely upon the infirmities of the plaintiff's case, it was its duty to stand upon the demurrer to the evidence interposed at the close of plaintiff's testimony. By its failure to do this, and subsequently introducing testimony on its own behalf, it waived its previous demurrer to the evidence. [Hall v. Coal & Coke Co., 260 Mo. 351, 168 S. W. 927; Riley v. O'Kelly, 250 Mo. 647, l. c. 660, 157 S. W. 566; Lareau v. Lareau, 208 S. W. 241, l. c. 243; State v. Ellis, 290 Mo. 219, 234 S. W. 845, l. c. 847.]

**Demurrer: Waiver.**

II. However, at the close of all of the evidence appellant renewed its demurrer and assigns as error the refusal of the court to give a peremptory instruction in favor of appellant.

As a preliminary to a consideration of this assignment of error it is necessary to ascertain whether the action is one *ex contractu* or *ex delicto*. The petition

Tort.     sounds in tort, but contains language that causes counsel to suggest an action *ex contractu* and that it might be a suit for breach of warranty under the Negotiable Instrument Law of Oklahoma, being the same as our law. Upon a careful analysis of the petition, under the authorities, we hold that it is an action *ex delicto* for fraud and deceit. [Rawlings v. Bean, 80 Mo. 614; Barnes v. McMullins, 78 Mo. 260; Hunter v. Sloan, 195 Mo. App. 69, 190 S. W. 57; Hess v. Appleton Mfg. Co., 164 Mo. App. 153, 148 S. W. 179; Lambert v. Jones, 91 Mo. App. 288; Bullock v. Wooldridge, 42 Mo. App. 356.]

To hold the appellant liable in an action for fraud and deceit it must appear from the testimony that at all the times mentioned in the petition and the evidence,

Representations.     R. L. Walker acted for the appellant as its agent (14a C. J. 775) and the burden was upon the respondent to show that the said Walker was not only the agent of appellant but that he was acting in such a representative capacity at the time the alleged fraud and deceit, if any, were practiced upon him.

The fact that Walker was president of the bank would not prevent him from engaging in individual and personal enterprises and from carrying on personal dealings. When respondent first went to the bank he told Walker he wanted to buy securities, as an investment, from the bank and wanted such as could be recommended to him as "gilt edge." Walker then advised him that they had a client engaged in the cattle business in Oklahoma and that they might be able to secure for him some good cattle paper. Respondent's own testimony showed that such cattle paper was obtained by Walker and not by the bank; that the notes were payable to one O. B. Avent, endorsed without recourse by him, and that the three notes for $10,300 each bore the additional endorsement of R. L. Walker.

All the documentary evidence offered by respondent disclosed that it was the personal dealings of Walker. All his references both in his correspondence with Wil-

liams, the maker of the notes, and with the Oklahoma bank, a creditor of Williams, were to the effect that *he* (not the bank) was making the loan. Moreover, the Oklahoma bank at the consummation of the loan drew its draft against R. L. Walker for over $26,000 and sent same to appellant bank for collection from Walker. This draft was held by appellant bank upon instructions until Walker had taken it up with his personal check and then the bank transmitted the proceeds of the collection to the Oklahoma Bank. *In buying the securities, respondent made his checks payable to R. L. Walker and not to appellant bank. He therefore must have known that he was dealing alone with Walker and not with the bank.* He even required that the cancelled checks be returned for the purpose of securing the endorsement of Walker, who, it appears, had failed, upon depositing the checks, to endorse same. Furthermore, it appeared that there was a discount on said notes amounting to $1275 and a cost for floating the loan of $2500, and it nowhere appeared that appellant bank either participated in said profit or discount, or even knew anything about the transaction, save only on the three notes for $2575 each. On the contrary it appeared affirmatively and was not controverted that the bank knew nothing about the transaction in question except that it, like appellant, became the purchaser of the above mentioned three notes and the one for the sum of $5150. In such case it became the personal transaction of Walker. [Lead and Zinc Inv. Co. v. Lead Co., 251 Mo. 721, l. c. 736.]

III. Before appellant could be held liable for fraud and deceit it must appear that the representations of the said Walker were made by him upon authority, either express or implied, or were subsequently ratified. [1 Mechem on Agency (2 Ed.), sec. 743; Gillett v. Railorad, 55 Mo. 315.] And moreover such representations as alleged in this case must have been made in writing as otherwise appellant could not be held. Section

Ratification: Representations in Writing.

2172, Revised Statutes 1919, provides that "no action shall be brought to charge any person upon or by reason of any representation or assurance made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance be made in writing, and subscribed by the party to be charged thereby, or by some person thereunto by him lawfully authorized."

This section has been construed as applicable to cases of the kind at bar. [Knight v. Rawlings, 205 Mo. 412, 104 S. W. 38; McKee v. Rudd, 222 Mo. 344, l. c. 367, 121 S. W. 312.]

Even if made by the president in writing, the duties of the president of a national bank, as commonly understood, do not warrant representations on his part as to the solvency or insolvency of persons doing business with the bank or otherwise. Therefore, the bank would not be responsible for such representations made by the president, even if made in a representative capacity (Crawford v. Bank, 67 Mo. App. 39), and particularly would this be true if such statements or representations were made by the agent in connection with his own personal dealings. [Merchants' Natl. Bank v. Lovitt, 114 Mo. 519.]

IV. Respondents say that where the petition occupies an indeterminate middle ground, so as to enable the plaintiff to. go to the jury on either one of two theories, it is the duty of the court to construe it according to either theory developed by the testimony and cite us to the case of Gaus Mfg. Co. v. Magee, 42 Mo. App. 307. The testimony did not develop a cause of action *ex contractu.* Assuming that the petition was susceptible to a construction as an action *ex contractu,* we must revert to the original question regarding the agency of Walker in the transaction and the ownership of the notes sold to the respondent. It appeared conclusively that, as above stated, appellant bank never owned the

Alternative Pleading: Breach of Warranty.

two notes for $10,300 each and that therefore there would be no such warranty arising in favor of respondent under the Negotiable Instrument Law as to enable him to make claim against appellant, and no basis for a claim of that character was made with respect to the three notes for $2575 each. Whether or not a liability exists in favor of respondent on account of the bank's endorsement of said three notes is not before us for decision and we express no opinion.

Counsel for both appellant and respondent have raised many other questions and have learnedly and ably discussed them in their briefs, but in the view we have taken of this case it is needless to prolong this opinion by a discussion of such questions here, as the judgment of the lower court was for the wrong party and must be reversed. It is so ordered. *Railey, C.,* concurs; *White C.,* not sitting.

PER CURIAM:—The foregoing opinion by REEVES, C., is adopted as the opinion of the court. All of the judges concur; *Higbee, P. J.,* in a separate opinion, in which *Walker* and *David E. Blair, JJ.,* concur.

HIGBEE, P. J. (concurring).—Plaintiff testified he said to Walker, "I will expect you people to furnish me paper out of your files if it is good and all right. Something you folks can stand back of and gilt edge." He said they thought they could.

Plaintiff later purchased several notes, some of which were indorsed by the bank, the others by Walker who was indorsee thereof. There was no request for the bank's indorsement. Walker told him at the time they had done business for the party for years and handled his notes, and that he had gone down there personally and had seen the cattle described in the mortgage. The inevitable conclusion from plaintiff's evidence and his conduct is that he relied upon the several indorsements; they constituted the contracts. If he understood he was getting notes the bank was "standing back of," the most

natural thing would have been to have required the bank's indorsement. Some of the notes were indorsed by the bank. Why did not plaintiff ask its indorsements also on the other notes? He had the clear right to have them so indorsed if he was purchasing them from the bank, but he did not even ask for its indorsement. I do not find any substantial evidence that plaintiff bought or understood he was buying these last-mentioned notes from the bank. On the contrary, plaintiff's own evidence shows they were Walker's notes and he bought them from Walker.

Nor is there any evidence tending to prove fraud on Walker's part in this transaction; none tending to prove that he did not believe the notes were well secured at the time he acquired and negotiated them to plaintiff. The strong probability is that the loss resulted from general decline in values. In an action for damages for fraud and deceit the rule is there can be no recovery without proof that the representations were false and fraudulent. [Stonemets v. Head, 248 Mo. 243, 268; Bragg v. Packing Co., 205 Mo. App. 600, 608.]

It is true that plaintiff and Walker were not on an equal footing. Williams and the mortgaged cattle were in a distant state. In such case representations as to value are not regarded as expressions of opinion but of fact. But this is not an action for breach of warranty; hence this phase of the matter is not involved in this action.

What is said in paragraph 3 of the learned Commissioner's opinion is predicated upon the previous conclusion that Walker, and not the bank, sold the notes found to have been Walker's notes. If, however, the bank, through its president, had sold the notes, and plaintiff had been induced to buy them by false and fraudulent representations as to the credit and financial standing of Williams, then I do not understand the opinion to hold that the case would fall within Section 2172, Revised Statutes 1919. [Knight v. Rawlings, 205

Mo. 412, 104 S. W. 38; McKee v. Rudd, 222 Mo. 344, 367, 121 S. W. 312.]

But I do not agree that Walker could obligate the bank for the payment of these notes by any mere representations as to the credit or financial standing of Williams.

Our statute has limited the power of the officers of a bank to assume or impose obligations upon the bank in connection with the sale or transfer of its paper.

In Taylor v. Fuqua, 203 Mo. App. 581, the St. Louis Court of Appeals considered the power of the cashier of a bank to sell its paper without previous authorization by the board of directors. The opinion refers to the amendment of Section 1112, Revised Statutes 1909, by the Act of 1915, striking out the words "sell" and "selling," so that said section, now Section 11762, Revised Statutes 1919, in that respect now reads:

"The cashier or any other officer or employee shall have no power to indorse, pledge or hypothecate any notes, bonds or other obligations received by said corporation for money loaned until such power and authority shall have been given such cashier or other officer or employee by the board of directors. . . . And all acts of indorsing, pledging and hypothecating done by said cashier, or other officer or employee of said bank, without authority from the board of directors, shall be null and void."

At page 587, the learned court said:

"This section, therefore, as it now stands, deprives a cashier merely of the power to indorse, pledge or hypothecate notes, etc., received by the bank for money loaned, without antecedent authority conferred by the board of directors; making any such act void. It does not purport to deprive the cashier of all power to sell notes or other obligations of which the bank may have title, in the ordinary course of business."

The statute having thus restricted the power of a cashier or president or other employee of a bank to in-

dorse, pledge or hypothecate the bank's paper, it would seem that by necessary implication the statute also denies him authority to bind the bank for the payment of paper he may sell by mere representations of the character in question, and so, indirectly, evade the statute. This would seem to fall clearly within the mischief to be remedied by the statute.

Walker's powers as president and agent of the bank were limited and circumscribed by the statute. All persons dealing with him as such must take notice of these limitations. He could obligate the bank for the payment of the notes in question only by the bank's indorsement subject to the conditions of the statute.

The demurrer to the evidence should have been sustained. I accordingly concur in the opinion of the learned Commissioner reversing the judgment. All concur.